## W. L. PHILLIPS v. STATE.

No. A-3719. Opinion Filed Jan. 21, 1922.
(203 Pac. 902.)

(Syllabus.)

1.   Evidence—Relevancy—Evidence Pointing to Another as Guilty Party. It is competent for the defendant to show, by any legal evidence, that some other person committed the crime charged, and that he had no participation in it. But this cannot be shown by testimony merely tending to show a possible motive on the part of another to commit the crime. The evidence offered must connect such other person with the fact; that is, some overt act on the part of another towards the commission of the crime itself. There must be evidence of acts or circumstances that tend clearly to point to another, rather than to the defendant, as the guilty party.

2.   Witnesses—Competency of Character Witness. Where a witness testifies that he knows the general reputation of a witness for a particular trait of character, he may then be permitted to state what that reputation is, provided it relates to the time of the offense and the residence of the witness whose reputation is attacked.

3.   Same. A witness to general reputation is not rendered incompetent because he cannot say that he has heard a majority of persons of any community, nor even any definite number of them, discuss that reputation.

4.   Same—Cross-Examination. As to knowledge ,of the general reputation of a witness for a particular trait of character, the

question must be referred largely to the conscience of the witness who testifies. A witness to general reputation must answer on his own responsibility and is then subject to cross-examination as to the source, extent and correctness of his information as to that matter. Whether the witness is sufficiently informed to give a general opinion arrived at from the general concurrence in the view which he expresses is a question for the jury to determine.

5.     Witnesses—Impeachment—Contradictory Statement. A witness may be impeached as to contradictory statement concerning any matter material to the issues in the case, but not as to immaterial and collateral matters.

6.     Same—Cross-Examination as to Relations with Accused. Questions may be put to a witness on cross-examination for the purpose of ascertaining his relations, business, social, or otherwise, with the accused. In this connection it is proper to show by cross-examination the fact of immoral relations subsisting between the witness and the party for whom called.

7.     Same—Improper Impeachment. For error in permitting improper impeachment of witness, see body of opinion.

Appeal from District Court, McCurtain County; A. A. McDonald, Judge.

W. L. Phillips was convicted of murder and sentenced to life imprisonment, and he appeals. Reversed and remanded.

W. L. Phillips was convicted at the September, 1919, term of district court of McCurtain county of the crime of murder, alleged to have been committed on the 22d day of October, 1918, by the defendant shooting one Bob Harris with a shotgun, inflicting mortal wounds, from the effects of which the said Harris instantly died.

The evidence discloses that the killing occurred early in the morning of the date alleged while the deceased was walking along a public highway in the neighborhood of Rufe, a small village in the western part of McCurtain county. Deceased was shot from ambush with a shotgun, and a boy about 12 years of age, who was walking along with the deceased at the time of the killing, testified that two shots were fired. At

the first shot the deceased fell, and this boy ran over to the side of the road and hid behind a dead tree. While in that position he saw the defendant, as he says, come out from some bushes at the side of the road, walk up close to the body of deceased, and fire a second shot into the head of the deceased. This boy, Williams, also testified that the defendant then walked away in the direction of his home, which was about three-fourths of a mile from the scene of the homicide. After the shooting the witness (Williams by name) walked into the town of Rufe, about one-half mile away, and there told some citizens what he had witnessed. The defendant was arrested at his home in the afternoon of that day. Defendant denied the killing and introduced his four children, ranging in ages from 10 to 16 years, who each testified that they were at home on the morning of the homicide, that they heard the shots fired, but that their father was at home at that time and had never left the premises that morning. The defendant denied the killing of the deceased, and also testified that he had never left his home on the morning of the killing.

The witness Williams was a stepson of the sister of the defendant, and prior to the defendant having moved into that neighborhood from another part of the state the witness Williams had been living with his stepmother, but a short time after or a short time before (as to exact time there is conflict in the evidence) the defendant and his family moved into the house of his sister the witness Williams moved to the home of his brother-in-law, Phil Lunsford, but at the time of the killing the witness Williams testified that he had been staying at the home of the deceased, Bob Harris.

In addition to the defendant's offer of an alibi an effort was made to discredit the witness Williams by showing that his general reputation for truth and veracity was bad. Of several witnesses introduced for this purpose only two testi-

fied that they knew his reputation for that trait of character and that it was bad. The others said they did not know anything about his general reputation.

Jeff D. McLendon and S. A. Horton, for plaintiff in error.

S. P. Freeling, Atty. Gen., and E. L. Fulton, Asst. Atty. Gen., for the State.

MATSON, J. (after stating the facts as above). During the progress of the trial counsel for the defendant offered to prove by several witnesses that about six or eight months before the homicide the deceased had been arrested and lodged in jail on charges of hog stealing and larceny of merchandise from private residences in the Rufe neighborhood, and that it had been frequently and openly discussed at that time by numerous persons in that neighborhood that the deceased would be killed if he got out of jail, and further that at the time of the homicide the deceased was at large on bail pending trial for these larcenies. Upon objection of the county attorney, the trial court excluded this proffered evidence, to which action the counsel for defendant excepted, and contended that the ruling of the trial court in this respect was erroneous and highly prejudicial to the substantial rights of the defendant.

No offer was made to show by either facts or circumstances that some one other than defendant was guilty of the commission of this homicide. All the defendant offered to prove was a state of ill feeling upon the part of the residents of the neighborhood in which the homicide was committed against the defendant about six months prior to the commission of the homicide, without any proof tending to connect any third person with the killing. The ruling of the trial court in excluding this proffered evidence was correct.

In Irvin v. State, 11 Okla. Cr. 301, 146 Pac. 453, this court held:

"It is competent for the defendant to show, by any legal evidence, that some other person committed the crime charged, and that he had no participation in it. But this cannot be shown by testimony merely tending to show a possible motive on the part of another to commit the crime. The evidence offered must connect such other person with the fact; that is, some overt act on the part of another towards the commission of the crime itself. There must be evidence of acts or circumstances that tend clearly to point to another, rather than to the defendant, as the guilty party.

"On a trial for murder, the defendant, for the purpose of showing that the stepfather of the victim may have committed the crime, and for the purpose of showing motive, offered to prove that he and his wife had separated, at which time he took with him the property of his wife; that he remained away from his wife until all the money had been squandered; that he then returned to her, because he hoped to profit by her children's estate; and that he knew the income from the property of stepdaughter was $500 per month. The defendant also offered to prove that, for some time prior to the murder, the stepfather was intimate with a woman other than his wife; this offer having been made upon the court sustaining objections to questions asked on cross-examination of the stepfather as a witness for the state. All the evidence offered on this line was excluded. Held, not proper cross-examination, and that the evidence offered was properly excluded."

For further authorities on this subject see body of the opinion in the Irvin Case.

It is next contended that the trial court erred in striking, and instructing the jury to disregard, the testimony of a witness for the defendant, concerning the general reputation of the prosecuting witness Grant Williams for truth and veracity.

In this connection the record discloses that on direct examination this witness had testified that he knew the general reputation of this Williams boy in the community where he

lived for truth and veracity, and that such reputation was bad. On cross-examination the witness was asked whom he had heard say that such reputation was bad, and he named one person. He was then asked if he had heard anybody else discuss it, and replied:

"He is the only one I recall at present."

Whereupon the trial court instructed the jury as follows:

"Gentlemen of the jury, when a witness testified on the witness stand that a man's character is bad for truth and veracity, and then states that he only knows his reputation on the statement of one man, you are instructed that that is not sufficient, and you will entirely disregard all the testimony of this witness along that line, to which remarks and rulings the defendant then and there excepted."

We believe that the ruling of the trial court in this respect was erroneous. The rule is well established that where a witness testifies that he knows the general reputation of a witness for a particular trait of character, he may then be permitted to state what that reputation is, provided it relates to the time of the offense and residence of the witness whose reputation is attacked. Ward v. State, 15 Okla. Cr. 150, 175 Pac. 557, and cases therein cited.

Nor do we believe a witness is rendered incompetent to testify as to general reputation because he cannot say that he has heard a majority of persons of any community, nor even any definite number of them, discuss that reputation. The general reputation of a person is dependent to a large extent on the habits, age, sex, and living conditions of the person testified about. The witness whose reputation was called into question in this case was a boy only 12 years of age, and it is entirely consistent with human experience that in all likelihood the reputation of a boy of that age would not be as clearly defined or as frequently discussed in the neighborhood as to become

so well known as the reputation of an older person. While the reputation of a witness of such tender age may not have been discussed generally by a majority of the people of the neighborhood in which he lived, the prevailing opinion of those who did discuss it may have been that his reputation for truth and veracity was bad, and there may have been a general concurrence in this opinion acquiesced in by the people of the community, although there was little discussion of it.

So that the courts have generally adopted the rule that as to knowledge of such general reputation the question must be referred largely to the conscience of the witness who testifies; that the witness must answer on his own responsibility and is then subject to cross-examination as to the source, extent and correctness of his information as to the matter to which he testifies. Whether the witness is sufficiently informed to give a general opinion arrived at from the general concurrence in the view which he expresses, we think, is a question for the jury to determine. The fact that such witness testifies that he knows such general reputation is a sufficient predicate to permit the expression of his opinion thereon. Such witnesses are not expert witnesses, and no question of law arises as to their competency to testify after having qualified on the subject of knowledge. The court erred, therefore, in the opinion of this court, in striking this evidence from the consideration of the jury, as it was within the sole province of the jury to determine the weight to be given to the testimony of the witness. The effect of the court's ruling in this respect was prejudicial to the defendant in this case for the reason that the conviction is based entirely upon the testimony of the witness George Williams sought to be thus impeached.

Further it is contended that the trial court erred in the admitting incompetent and irrelevant evidence in following particulars:

· Defendant introduced his daughter, Ariel Goodson, as a witness in his behalf, who testified that she was at her father's house on the morning of the homicide, had stayed there the night before, had eaten breakfast there that morning, and had heard the fatal shots fired; that her father was at home at the time the shots were fired, was not at the scene of the homicide, and did not leave his premises that day until the time of his arrest.

On cross-examination by the county attorney this witness was asked in substance if she was not the same young lady that came to the county attorney's office and made a sworn statement that her father (defendant) was the father of an illegitimate baby by her. This question was objected to by counsel for defendant, and after consultation between the court and counsel on both sides the court permitted, over objection and exception of defendant, the witness to be asked the following questions:

"Q. You are the same young lady that came into the county attorney's office about two months ago and filed an information against this defendant, your father, charging him with being the father of your baby? A. No, sir.

"Q. You didn't do that? A. (No answer.)

"Q. I will ask you if you didn't come into the county attorney's office and make a statement in writing to Mrs. Cyphers, the county attorney's stenographer, which was taken down in shorthand and subscribed to by you in which you stated that your father was the father of your baby. A. No, sir.

"Q. Didn't you make that statement to Mr. Wilkinson? A. No, sir.

"Q. You didn't? A. (No answer.)

"Q. Didn't you do that about two months ago? A. No, sir.

"Q. And didn't you—wasn't your father arrested on that information—

"By Mr. McLendon: We object to that now—

"Wait until I ask the question. Q. Wasn't your father arrested on that charge, and on the day of the trial, preliminary trial to be had, I will ask you if you didn't come into the county attorney's office and state to Mr. Wilkinson and to me, in the presence of Mrs. Cyphers that you had lied about the statement against your father, and wasn't the case dismissed against him for that reason? A. (No answer.)

"By the Court: Answer the question. A. No. sir.

"By Mr. Gore. Q. You didn't do that? A. (No answer.)

In rebuttal the trial court permitted the state to introduce the county attorney's stenographer, who, over objection and exception of defendant, was permitted to testify that the witness Ariel Goodson, about two months before the trial of this case, had appeared at the county attorney's office and made a sworn statement which was reduced to writing, which said sworn statement was read in evidence and was as follows:

"I, Ariel Goodson, make the following statement of my own free will, and without any influence being used by any one for the purpose of obtaining same. My name is Ariel Goodson. I am the wife of Oliver Goodson, and the daughter of W. L. Phillips. Oliver Goodson, and myself were married at Idabel, Okla., on or about the 19th day of January, 1919, and have since been husband and wife. Up to that time I had been living with my father, W. L. Phillips, and my other three sisters.

"I was 16 years of age on the 3d day of June, 1919, being now in my sixteenth year. Some time during the month of June, 1919, I gave birth to a girl baby near Ackworth, Tex., which lived about three weeks and died of congestion of the brain. My father, W. L. Phillips, was the father of my child and is responsible for my condition in this respect.

"About a year ago while my father and I and my other sisters were living in Okmulgee county, Okla., at the town of Coalton, my father began to have intercourse with me, and same has continued from time to time up until about one month ago. During said time W. L. Phillips has repeatedly had intercourse with me, and as a result of which my child was born.

"I make this statement with the full knowledge of the consequences, and that in order that substantial justice may be done."

Further in rebuttal the assistant county attorney testified that the witness Ariel Goodson had appeared before him and made an oral statement concerning her father's relations with her, which was after reduced to writing and sworn to by her; that a sworn complaint or information was filed against this defendant, based on the sworn statement of the witness Ariel Goodson; that the defendant was arrested on said charge; and that on the day of the examining trial the witness Ariel Goodson again appeared in the county attorney's office and stated that she had lied on her father, whereupon the charge against him was dismissed. It is strenuously contended that the admission of this rebuttal evidence was clearly incompetent and prejudicial to the defendant.

The witness Ariel Goodson was the eldest child of the defendant. On that account she was the most important witness in support of his alibi. If her evidence was successfully impeached, the effect was to discredit the testimony of the other children on that subject.

The purpose of the state, by the introduction of this extrinsic evidence against the witness Ariel Goodson on rebuttal, was to show that on another occasion in a proceeding entirely distinct from the case in hand the witness had made contradictory and apparently false statements, on the first occasion

against her father, and later in his favor. This was not an effort on the part of the state to impeach the witness by extrinsic evidence as to contradictory statements concerning any matter material to the issues in the instant case. The rule is well established that as to such class of contradictory statements, if denied, extrinsic evidence may be produced against the witness, but not so as to immaterial or collateral matters such as this. Payne v. State, 10 Okla. Cr. 314, 136 Pac. 201; Hartwell v. State, 15 Okla. Cr. 416, 177 Pac. 383.

Further, the introduction of the sworn statement supra had the effect of incumbering the record with evidence of another crime alleged to have been committed by the defendant forming no part of the res gestae of the crime for which he was on trial and of which he had not been convicted; nor does such evidence come within any of the well-known exceptions to the general rule against proof of distinct offenses.

Nor is the court unmindful of the rule which permits questions to be put to a witness on cross-examination for the purpose of ascertaining his relations, business, social, or otherwise, with the accused. And in this connection it is always proper to show by cross-examination the fact of immoral relations subsisting between the witness and the party for whom called. Castleberry v. State, 10 Okla. Cr. 504, 139 Pac. 132. And the rule is quite general to the effect that, where on cross-examination the witness denies such relations, extrinsic evidence may be used to impeach the witness. Wigmore on Evidence, vol. 2, §§ 943, 949.

So in this case, had the county attorney inquired of the witness Ariel Goodson, if she had not a short time prior to the giving of her testimony sustained illicit sexual intercourse with her father, the defendant, it would have been proper upon her denial of such relations to have produced either by her

former admission or by other witnesses testimony to the effect that she had sustained such relations.

But it is clear from an examination of this record that such was not the purpose of the cross-examiner, nor was the impeachment along this line. At no time was the witness asked if she had ever sustained illicit sexual relations with the defendant, but the inquiry was directed to whether or not she had not made an affidavit to that effect and afterwards had stated that her affidavit was false.

The effect of this line of cross-examination and impeachment was to show that in another proceeding, not connected with the case in hand, the witness had made contradictory and apparently false statements.

We are of the opinion that to permit the witness to be impeached by extrinsic evidence to show such variant statements was improper and prejudicial to the defendant. It had no tendency to show any illicit relations between the witness and the defendant, because the extrinsic evidence itself was contradictory, and the last statement of the witness proved in rebuttal was a denial of such relations. Evidently the county attorney believed the denial because he dismissed the prosecution then pending against this defendant. If the county attorney believed the denial and dismissed the prosecution, why inject into this trial a matter so foreign to the issues and in which so little credence was placed, unless it was for the purpose of impeachment on contradictory statements? That could have been the only purpose, and that clearly was the only probative effect, of the rebuttal evidence.

While it is permissible on cross-examination and within the discretion of the trial court to permit at times immaterial and collateral matters to be inquired of a witness for the purpose of testing the witnesses' credibility, source of information,

and the like, the rule is universal that as to such matters the examiner is bound by the answer of the witness. Payne v. State, 10 Okla. Cr. 314, 136 Pac. 201.

It is the opinion of this court that the trial court erred in admitting the extrinsic evidence complained of in rebuttal for the purpose of impeaching the witness Ariel Goodson; that the admission of the sworn statement as against the defendant having a tendency to evidence his guilt of a distinct offense disconnected from that for which he was being tried was prejudicial to him in this case, and the admission of the testimony of the assistant county attorney as to the contradictory statements of the witness Ariel Goodson was also clearly erroneous and in no way connected with the issues of the instant case, and was the impeachment of the witness by proof of contradictory statements on an immaterial and collateral matter. This is not permissible. Payne v. State, supra; Willis v. State, 13 Okla. Cr. 700, 167 Pac. 333.

Other minor errors are complained of, but a consideration of the entire record convinces the court that the same are without substantial merit.

In view of the fact that this conviction is based solely upon the evidence of the witness Grant Williams, a 12 year old boy, and that the defense interposed was an alibi, and the witness Ariel Goodson was such an important witness for the defendant in support of his defense, the conclusion is reached that for the erroneous action of the trial court in striking from the consideration of the jury the evidence tending to impeach the witness Grant Williams as to truth and veracity and further in permitting the state in rebuttal by extrinsic evidence for purpose of impeachment of the witness Ariel Goodson to disclose the things above enumerated, we think this conviction should be reversed; and it is so ordered.

The warden of the penitentiary at McAlester will deliver the defendant to the sheriff of McCurtain county, who will hold him in custody until otherwise ordered according to law.

DOYLE, P. J., and BESSEY, J., concur.