# JESSE M. ROSS v. STATE.

No. A-6441.   Opinion Filed March 16, 1929.
(275 Pac. 401.)

Ross Rizley and E. B. McMahan, for plaintiff in error.

Edwin Dabney, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter called the defendant, was convicted in the district court of Cimarron county, of the larceny of a hog, and was sentenced to imprisonment in the state penitentiary for a term of three years.   Motion for new trial was filed and overruled, exceptions saved, and appeal taken to this court.

The testimony in subtsance for the state is as follows: Phillip Schrier testified he lived in Cimarron county on or about the 11th day of March, 1926; that he was sick at the time; that when he last saw the hog that is alleged to have been stolen was on Wednesday night prior to its being killed on Friday; that the hog had been castrated on Sunday prior to the time it was alleged to have been killed; that they broke off one of his tusks so he could not cut the other hogs; the hog weighed between 250 and 300 pounds; that he learned from his son Harold Schrier the hog had been killed. "I do not know what time the hog was killed, I did not consent to any one taking the hog or killing it."

On cross-examination witness stated that defendant lived about two miles from him; he had known defendant for three or four years; they were pretty good neighbors until last winter, when the case of Jess Lovitt came up, since that time he was not mad, but "we were not very good friends." Witness was then asked, "You had a school fight up down there too, didn't you?" To which the state objected as immaterial, and the court sustained the objection. The question was then asked, "Isn't it a fact this defendant was responsible in some degree in getting your son discharged from driving the truck which carried the school children to school?" The state objected as incompetent, irrelevant, and immaterial, and the court sustained the objection. Defendant excepted. "All I know about the hog disappearing my children told me; I helped castrate the hog and break the tusk on Sunday before he was reported to be gone the following week; the tusk was broken off with big wire pinchers."

Willie Schrier, called as a witness, testified: He was 20 years old. That Phillip Schrier was his father. That he was at home on the 11th day of March, 1926. That his father owned a big, black stag hog. That on

the 11th day of March the hog was gone out of the pen, and he went to the northwest corner of the pen, and found the intestines of the hog, and found where he was dragged through the fence. There was blood on the other side of the fence, and the horse tracks went east from there and turned north down the fence to the southeast corner of the section toward defendant's house. He corroborated his father as to the breaking of the hog's tusk at the time they castrated him on Sunday, when the hog was missed, and the probable weight of the hog. That it rained a couple of days before, and the soil was wet when they missed the hog. He followed the tracks from where he first discovered them down to the gate of the defendant. After he found the tracks on Saturday, he phoned Mr. Barrick. He called the sheriff about 4 o'clock in the afternoon, and the sheriff came out himself, and then went back and got a search warrant. On Monday afternoon when the parties got out he went with them, and they tracked the man's track, and the horse tracks. They went down to the place where defendant lived. "We found some back bones and spare ribs." This was objected to for the reason it had not been shown they had a search warrant, and the search, if any was made, was under an illegal search warrant. Objections were overruled, and defendant duly excepted.

Testimony was then introduced as to the lower jawbone of the hog which was found in front of the door of the defendant, to which the defendant objected, and the objection was overruled, and defendant excepted. "We found some bones of spare ribs, that is, some bones that had been cooked, we found horse tracks, one foot of which made a crooked track in the ground; there was a white horse at defendant's which made the same kind of a track; we also found a sack and rope which had blood on them; the tracks were vis-

ible, it had snowed in the meantime but the man's tracks we discovered were just like the defendant's. I sifted the dirt and found the piece of tusk which was broken off; I found it the following Friday after the hog was missed and brought it to the sheriff." Defendant had on a coat, and the sleeves had some blood on them. Loving claimed the coat, but he said he did not know anything about the blood. The defendant was present when Loving claimed the coat.

On cross-examination he claimed he had known the defendant for three or four years. He used to drive a school truck in the vicinity where defendant lived. Witness was then asked, "And you lost the job, didn't you?" The state objected on the ground that it was incompetent, irrelevant, and immaterial. The court sustained the objection, and defendant excepted. Witness was then asked if he had not been mad at the defendant ever since he lost the job, and the same objection was interposed as was interposed to the previous question, and the court sustained the objection. The defendant then made an offer, for the purpose of showing the credibility of the witness, that bad feeling existed, and that witness was a son of the prosecuting witness, and that for some months previous to the time of the larceny of the hog in question this witness was driving a truck hauling school children to school in that vicinity; that some time prior to his obtaining the job as truck driver the defendant in this case had been a witness in a case in which the prosecuting witness in this case was interested, and that, by reason of the relationship growing out of that lawsuit, this witness refused to haul the children of the defendant to school in the truck; that defendant complained to the school board, and as a result the school board canceled the employment of this witness, and that by reason thereof they have not been friends since. The state objected

to the offer made by the defendant, which objection was sustained, and defendant duly excepted. Witness stated he saw the hog on Tuesday. Some time about 11 o'clock Thursday he missed the hog, when he went out to water them. "When I missed the hog I went to looking for tracks and I found them; I could tell where the hog had been taken out under the wire and I found the intestines, heart and liver. I followed the tracks a little ways and then came back to the house; the tracks went east down the hog fence."

The state further introduced testimony tending to show that a part of the hog's jaw was found on the premises of the defendant. The sheriff testified he had a search warrant, and that, when defendant's home was searched, he found a sack with some blood on it and some white hairs, and a rope with some blood on it, and some bones, looked like the ribs of a hog and some backbones. The sheriff on this search was accompanied by other witnesses who testified to the same facts as did the sheriff. Evidence of tracks was introduced attempting to show they corresponded with the defendant's track, but there had been considerable snow and some rain the night the hog was stolen, the night before the tracks were found by the sheriff and the other witnesses. The evidence of the state is wholly circumstantial. The defendant, as a witness in his own behalf, denied any knowledge of the hog being stolen, or having anything to do with the stealing of the same. He contended there was ill feeling against him by Phillip Schrier and his son Willie Schrier, because of his having been a witness against Phillip Schrier and having reported Willie Schrier to the school directors because he would not haul those who were going to school who lived with the defendant. The defendant by two witnesses proved that on the night of the alleged larceny of the hog he was at his

home. Artie Weldon slept in the same bed with him, and Irene Staggs slept in the bed with defendant's mother in the same room. Both testified that defendant went to bed before they did, and was there the next morning; Artie Weldon testifying he slept in the front of the bed, and that defendant did not leave the bed during the night.

Several witnesses testified that a half-brother of the defendant, Ben Staggs, the Saturday evening after the hog was alleged to have been stolen on Thursday, came to defendant's house and brought him some spare ribs and a hog's head and backbones; they were cooked and eaten at defendant's house; that the bones the sheriff and his men found were probably the bones from which the meat had been eaten that was brought to the house by Ben Staggs, the half-brother of the defendant, whose home was given as Dalhart, Tex.

On cross-examination by the state, the witness Phillip Schrier was asked:

"Did he visit in your home and you visit at his home? A. We did not visit, but we were pretty good neighbors, I thought he was a good neighbor.

"Q. You thought he was until when? A. Until last winter when the case came up in which Jess Loving —up until that time we was good friends.

"Q. And since that time you have been on friendly terms? A. We was not mad, we were not just good friends, we just let each go his own way.

"Q. You had a school fight down there too, didn't you?

"By Mr. Sweet: Objections, that is immaterial.

"By the Court: Sustained.

"Q. Isn't it a fact that this defendant was responsible in some degree in getting your son discharged from driving the school truck?

"By Mr. Sweet: Objected to, that is incompetent, irrelevant, and immaterial.

"The Court: Sustained. (The defendant excepts.)"

The defendant on cross-examination propounded the following questions to Willie Schrier:

"Q. You used to drive the school truck in your vicinity? A. Yes, sir.

"Q. You lost your job didn't you? (.Objected to as incompetent, irrelevant and immaterial, by Mr. Sweet.)

"The Court: Sustained. (The defendant duly excepted.)

"Q. And you have been mad at the defendant ever since you lost that job? (Objected to by Mr. Sweet, as incompetent, irrelevant, and immaterial.)

"The Court: Sustained."

Offer was then made to show, as a part of the cross-examination of Willie Schrier, for the purpose of showing his credibility, that a bad feeling existed between the defendant and this witness; that for some months previous to the time of the larceny of the hog in question that this witness was driving a school truck, hauling the children in the vicinity to school; that some time prior to his obtaining the job as truck driver the defendant in this case had been a witness in a case in which the prosecuting witness in this case was interested, and that, by reason of the relationship growing out of that lawsuit, this witness refused to haul the children of this defendant to school in the truck; that defendant complained to the school board, and, as a result, the school board canceled the employment of this witness, and by reason thereof they were not very good friends since. The state objected on the ground that it

was incompetent, irrelevant, and immaterial, and the court sustained the objections.

When the defendant went on the stand, he offered to prove the same facts as to the ill feeling between Phillip Schrier and Willie Schrier and himself, but the state objected, and the objection was sustained, and defendant excepted. Sheriff Barrick was recalled for further examination, and was asked if he went back down to the defendant's house some days after he was down there about the 17th of March, and that he smelled something like fresh lard. The testimony on behalf of the defendant was that one of the ladies was making soap, and the witness went into detail as to how the soap was being made. The sheriff was also asked regarding a conversation he had with the defendant about the 16th of March, 1926, and he said, "I and Mr. Shaw went to the jail and Mr. Shaw asked Mr. Ross where the rest of the hog was, and I said, 'You just as well come clean because I have been to Dalhart, Texas.'"

At this point defendant objected to what this witness may have said about anything happening in Dalhart, that is, just getting in what he tried to yesterday. The court overruled the objection, and defendant duly excepted. "A. Mr. Staggs told me he did not bring any meat to your place." The defendant objected to what he said Staggs told out of the presence of the defendant.

"The Court: That is what you told the defendant? A. Yes, sir.

"The Court: Overruled. (The defendant excepts.)"

The defendant then moved that the testimony of the witness Barrick relative to the last conversation that took place at Dalhart be stricken as hearsay; it being out of the presence of the defendant and being incompetent, irrelevant, immaterial and prejudicial.

"The Court: That is what he told the defendant? (Objections. Overruled.)

"Mr. Rizley: I mean the conversation he had wasn't in the presence of the defendant, the jury isn't taking the conversation but only what the witness told the defendant about it, and that is competent.

"Mr. Rizley: Exceptions."

The foregoing is all the testimony we deem necessary to set out to arrive at the proper decision in this case. Plaintiff in error assigns several separate and distinct errors alleged to have been committed by the trial court. First, it is urged by the defendant that the trial court erred in refusing to permit the plaintiff to introduce legal and competent evidence on behalf of his defense in said cause. On cross-examination of Phillip and Willie Schrier the defendant attempted to show that the witnesses were prejudiced against him by reason of a lawsuit in which he was a witness, and the court sustained the objection to the questions of the defendant, and would not permit him to go into the question of the bias or prejudice on cross-examination.

In Castleberry v. State, 10 Okla. Cr. 504, 139 P. 132, the court said:

"The state has the right, on cross-examination, to show the nature of the relations existing between the witness and the defendant, so far as their relations are such as would create a bias that might reasonably be supposed to affect the credibility of the witness, and this rule cannot be changed by the fact that such evidence would probably prejudice the defendant in the minds of the jury."

In Phillips v. State, 20 Okla. Cr. 415, 203 P. 902, this court in the sixth paragraph of the syllabus said:

"Questions may be put to a witness on cross-examination for the purpose of ascertaining his relations, business, social, or otherwise, with the accused. In this connection it is proper to show on cross-examination the fact of im-

moral relations subsisting between the witness and the party for whom called."

In Hennessee v. State, 29 Okla. Cr. 72, 232 P. 856, this court held:

"The defendant has a right, on cross-examination, to show the nature of the relations existing between the prosecuting witness and the defendant, so far as their relations are such as would create a bias that might reasonably be supposed to affect the credibility of the witness"—citing with approval Smith v. State, 14 Okla. Cr. 349, 171 P. 341.

The conviction in this case in a large measure rested on the testimony of Phillip and Willie Schrier; at least their testimony is a large portion of the chain of circumstances upon which the conviction of the defendant is based. We hold that the jury were in all fairness entitled to know what the personal relation and feeling of these witnesses were against the defendant, in order to intelligently pass upon the credibility of the two prosecuting witnesses. Under the ruling of the cases cited the defendant was entitled to show upon cross-examination of the witnesses their interest in the case, their feeling toward the defendant, and their bias or prejudice against him, if any, and it was error for the court to refuse to permit the defendant to show by the witnesses their feeling against him.

It is further urged by the defendant that the court erred in giving his instruction No. 3½, which is as follows:

"The state relies for a conviction upon 'circumstantial evidence.' Circumstantial evidence is the proof of certain facts and circumstances from which a jury may infer other connected facts which usually and reasonably follow, according to the common experience and observation of mankind.

"There is nothing in the nature of circumstantial evi-

dence that renders it less reliable than any other class of evidence. In order to warrant a conviction, however, you should find that the circumstances concerning the crime charged are such as not only are consistent with the defendant's guilt, but inconsistent with his innocence."

The defendant contends that the above instruction is incomplete and not a proper instruction of the law on circumstantial evidence and the same is confusing to the average mind of the juror, and that the court should have instructed the jury in connection with the instructions given.

"That in order to warrant a conviction the jury should find that the circumstances concerning the crime must be sufficient to exclude every reasonable hypothesis other than defendant's guilt, and that the circumstances must be consistent with each other."

This court has passed upon the question of an instruction upon circumstantial evidence several times, and has laid down and defined what the proper instruction on circumstantial evidence should be, and it is the duty of the court, when it undertakes to give an instruction based upon any part of the evidence in the case, or any branch of the case, to make that instruction clear and properly declare the law. The instruction given in this case is not a complete and correct statement of the law on circumstantial evidence as applied to the facts as disclosed by the record, and should not have been given in the form it was.

In Baldwin v. State, 11 Okla. Cr. 228, 144 P. 634, this court held that an instruction upon circumstantial evidence should be substantially as follows:

"You are instructed that the state relies for a conviction in this case upon what is known as circumstantial evidence, and in this matter you are instructed that, to warrant a conviction upon circumstantial evidence, each fact necessary to the conclusion sought to be established (that is, the guilt of the defendant) must be proved by competent evidence, beyond a reasonable doubt, and that all the facts

and circumstances proven should not only be consistent with the guilt of the accused, but consistent with each other, and inconsistent with any other reasonable hypothesis or conclusion than that of his guilt, and sufficient to produce in your minds the reasonable moral certainty that the accused committed the offense charged against him. And you are instructed that, when the circumstances are sufficient under this rule herein given you, they are competent and are to be regarded by the jury as competent for your guidance as direct evidence."

The instruction given was improper and was prejudicial to the rights of the defendant, and did not state the rule of law correctly. The defendant in this case may be guilty, but, upon the trial of the case, he should be tried according to law, and it is the duty of the court to see that he is properly tried.

There are other errors assigned, but in the view we take, some are without merit, and it is not necessary to consider the others. The judgment is reversed, and the case remanded, with directions to the trial court to grant a new trial to be conducted according to law.

EDWARDS, P. J., and CHAPPELL, J., concur.