## JAMES H. SMITH v. STATE.

No. A-2235.   Opinion Filed March 14, 1918.

(171 Pac. 341.)

1. **APPEAL AND ERROR—Discretion of Trial Court—Change of Venue—Review.** A petition for a change of venue is addressed to the sound discretion of the trial court, and, unless it clearly appears that there is an abuse of such discretion, this court will not reverse the judgment for the failure of the trial court to grant a change of venue.

2. **CONTINUANCE—Application—Absence of Witness.** An application for continuance because of the absence of a witness should show due diligence.

3. **EVIDENCE—Other Offenses.** Evidence of an offense other than the one charged is admissible only when it tends to prove the offense charged. To be competent and admissible, it must have some logical connection with the offense charged.

4. **WITNESSES—Constitutional Privilege—Waiver—Cross-Examination—Impeachment.** A defendant, by availing himself of the privilege of testifying in his own behalf, thus waives his constitutional privilege and has all the rights and is subject to the same rules of cross-examination and impeachment as other witnesses.

5. **WITNESSES—Credibility—Prior Conviction—Statute.** Section 5046, Rev. Laws 1910, permits the proof of a prior conviction of a defendant in a criminal case for the purpose of affecting his credibility. This proof may be made either by the record or by the cross-examination of the defendant, and cross-examination as

to other separate and distinct transactions and offenses is not permissible, unless such testimony tends to prove the commission of the offense charged, and should in general be limited to matters pertinent to the issue, or such as may be proved by other witnesses.

6. **TRIAL—Instructions—Impeachment of Witnesses.** Where a conviction depends upon the testimony of an accomplice who is a confessed perjurer and a convict, and another witness was a convict, and several of the witnesses whose testimony was relied upon to corroborate the accomplice were confessed perjurers and were impeached by testimony showing that their general reputation for truth and veracity was bad, it was error to refuse to instruct the jury on the law applicable to the impeachment of witnesses.

*Appeal from District Court, Washita County;*
*G. A. Brown, Assigned Judge.*

James H. Smith was convicted of the theft of two mules, and he appeals. Reversed.

On July 11, 1913, the county attorney of Washita county filed an information in the district court of said county charging James Smith with the theft of two mules, the personal property of the Colony Mercantile Company, and alleging that said crime was committed about the 30th of November, 1910. Upon his trial he was found guilty and his punishment fixed at five years' imprisonment in the penitentiary. The evidence shows that the pair of mules were stolen from the Colony Mercantile Company on the night of the 30th of November, 1910; that the mules were found west of Mayfield, Kan., and the harness taken with the mules found at Alva, and also a buggy taken from Weatherford with the mules was found at Alva.

The evidence connecting and tending to connect the defendant Smith with the crime, briefly stated, was as follows:

John Samples testified: That at the time in question he lived in Weatherford, and had been in the livery busi-

ness there with the defendant, but was at date of trial in the penitentiary at McAlester, serving a ten-year term for stealing the said mules. That on the night of November 30, 1910, he went south from Weatherford about three-quarters of a mile and waited until Smith came, and they went on to Colony; each riding a bay horse. They reached Colony about 8 o'clock. That they met two rigs on the way, one south of Weatherford at the jog, and the other about four miles north of Colony. That they first took the harness, and afterwards Smith led the mules out while witness held their horses. They then went west two or three miles and met some one driving an automobile, then went on to Weatherford, and witness stopped at the creamery while Smith fetched an old buggy that had belonged to Pete Cates, and witness hitched the mules to it. That witness drove the mules to Alva and sold the mules, buggy, and harness to one Pruitt for $330. That he kept $30 and deposited $300 in the bank there in the name of J. H. Smith. That a short time afterwards he drew out the money and bought a ticket for Geary, and from there went to El Reno, and then went to Hydro, and there telephoned to Smith, and he met him at Hydro and took him to Weatherford, and on the way he gave Smith $100 of the money. That, when he was arrested for stealing the mules, Smith helped to frame a defense for him. That George Lama was to swear that he saw witness at El Reno, and that Smith was to get witness out of the penitentary. That Smith wrote him several letters while he was in the penitentiary, which letters were produced and read in evidence. The tenor of the letters is that Smith was the friend of John Samples and was trying to help him by sending him money and trying to get a pardon for him. On cross-examination he testified that Smith that

day had been driving Mr. Near; "that he got back before bedtime," and took Mr. Near to the hotel, and came back to the barn, and then they started on the trip to Colony; that a mile and a half out they met a wagon or buggy and spoke, and within three or four miles of Colony they met another rig; that witness went to one side and Smith to the other, and they spoke to the person driving; that no one went with him on his way to Alva. The transcript of his former testimony was read, contradicting his statements on this trial.

Eddy Keyes testified that, when John Samples was prosecuted for stealing the mules, he had a conversation with John Samples and Jim Smith about his testimony as a witness in Samples' trial, and they wanted him to swear that he saw John Samples in El Reno about the time the mules were stolen, and it was not true; that he heard Smith tell John Samples to stand pat and not to turn him, and he would help Samples; that after John Samples had gone to the penitentiary he was present when Jim Smith told Carl Samples to take a team of horses to apply on John's lawyer fee, and Carl Samples asked witness to go with him to the pasture to get the team, and they went out to the pasture and brought the horses in and put them in Samples' barn. His cross-examination shows that he had been a bootlegger, had been convicted of theft, and at the time in question was living with a prostitute.

Roy Hahn testified that he was cashier of a bank at Alva, and on December 3, 1910, cashed a check drawn on the First National Bank of Alva for $300, payable to J. H. Smith, and signed by J. H. Pruitt; that John Samples was the man who presented the check.

W. M. Griggs testified that he lived north of Colony, and on the night of November 30, 1910, he was on his way home, and about four miles out· from Colony he met Mr. Smith and Mr. Samples, going south; that he was traveling in a hack and they were horseback; that as they passed they separated and one went on one side and the other on the other side; that he had known Samples and Smith for several years. On cross-examination he stated that Jess Hitt was with him; that he did his trading at Colony, and the next morning attended a sale near there and heard about the mules being stolen; knew that John Samples was arrested for stealing the mules, but never spoke about meeting him and Smith; never told anybody that he had seen Samples and Smith that night until questioned on the witness stand; that Samples and Smith as they passed him said, "How do you do."

Leroy Griggs testified that he lived about three miles northwest of Colony; that on the night of November 30th he met two fellows on horseback about a mile north of Colony, and as they passed both of them said, "How do you do?" and that he recognized John Samples and Mr. Smith by their voices; that it was then between 8 and 9 o'clock. On cross-examination he stated that he attended a sale near Colony the next morning and heard that the mules were stolen and knew about John Samples' arrest and trial for stealing the mules, but had never said anything to anybody about seeing these men that night.

George Lama testified that he lived at El Reno on or about November 30, 1910, and had a conversation with John Samples and Jim Smith after Samples' arrest, and they wanted him to testify as a witness for Samples that he saw John Samples in El Reno on the 2d and 3d days

of December, and that as a witness he did so testify, and that his testimony was false; that he had been convicted of gambling and carrying a sixshooter.

Carl Samples, a brother of John Samples, testified that he was then serving a three-year sentence in the penitentiary at McAlester for cattle theft in Caddo county; that after his brother Jim was convicted and sent to the penitentiary he had several "talks" with the defendant Smith; that he was sitting in Smith's barn office and heard Smith say to Norman Henry and others that John Samples ought to have been in the penitentiary ten years sooner, and he stepped up and Smith apologized to him; that Smith told witness he paid part of the lawyer's fee, and witness told Smith he was just as guilty as John was, and he said at first he was not, but finally admitted that he was in it; that another time Smith told him he just got $20 out of the mule deal; that Smith told him he had a team that he would give to Connell; that the lawyer and witness went with Eddie Keyes to the pasture and got the horses and turned them over to his father. On cross-examination he stated that on the night the mules were stolen he was down in Caddo county; that he knew when his brother John took the trip to Alva; that the defendant Smith tried to hire him to testify as a witness for his brother John; that Ted Bailey was his brother-in-law and visited him two or three times while he was in jail at Arapaho; that he did not tell Ted Bailey that witness and George Lama were the fellows that took those mules away from Colony.

Pete Cates testified that a short time prior to November 30th he sold an old buggy with a tongue in it to John Samples.

B. E. Duvall testified that on the evening of November 30th he saw John Samples east of Weatherford riding a black horse.

A stipulation by the state and the defendant was filed that in 1910 the 30th of November was Wednesday, and the defendant waived his constitutional right to be confronted with witness Walter F. Dickens, agreeing that the questions and answers might be read as the testimony said witness would give if he were present. The testimony of the witness is as follows: That he resides at Red Lake, Minn.; on November 30th lived at Colony, Okla., and was superintendent of Indian school there; was west of Colony on the night of the theft; met two men about 10 o'clock, each riding a small horse, and each leading a mule with harness on; witness was in an automobile; had been acquainted with Jim Smith for a long time prior to that; saw Jim Smith the next morning in the vicinity of Colony in company with Mr. Near; witness told Smith and Near about the mules having been stolen.

For the defense, C. E. Near testified that he was a collector for the International Harvester Company; that his territory included Custer county; that he was in Weatherford on the 29th and 30th of November and made a drive in the afternoon with Jim Smith, and got back about 6 o'clock; that he went to the Smith barn between 8 and 9 o'clock that evening to outline a drive for the next day, and talked with Jim Smith; that he was at the barn until 10 o'clock or later; that John Samples was there at 9 o'clock, but witness did not see Samples after the train came in; that he walked to the Park Hotel with Jim Smith after 10 o'clock, and Smith went on in the direction of his home; that he left Weatherford with Jim Smith the next

morning, and they drove towards Colony; that they met Mr. Dickens west of Colony, and Mr. Dickens spoke of the mules having been stolen the night before; that about 8 o'clock that evening he and Smith got back to Weatherford, and witness stayed at the Park Hotel that night.

Charles C. Penn testified that in 1910 he was in the hotel business at Weatherford; that he was acquainted with C. E. Near, and he produced his hotel register showing that Mr. Near registered there on the 29th of November, 1910, and identified the signature; that he knew the general reputation of George Lama for truth and veracity, and that it was bad.

Ed Austin testified that he bought out John Samples' interest in the livery business with Smith in July, 1910; that Jim Smith was driving with Mr. Near on the 30th of November and John Samples was around the barn that evening; that he slept at the barn and heard a rig come in during the night; that John Samples was there the next morning in bed with a man by the name of Wright; that there was a rig taken out of the barn that night, and the barn account showed a charge against George Casey. The charge against George Casey was submitted to the jury, and defendant's attorney, knowing that the county attorney had a magnifying glass, called for it, and turned it and the book over to the jury with the request that they examine a particular item, the one that Mr. Smith, special counsel for the state, said had been erased, and the jury examined the book with the glass.

George Casey testified that he had been acquainted with Jim Smith and John Samples for years; that he was a farmer and lived out from Weatherford; that in the early winter of 1910 he made a drive from Weatherford to his

home; that he had been to Clinton and arrived at Weatherford at 9 o'clock or later in the night; that he got the rig at Smith's stable, and John Samples did the driving; that it was six miles out; that after John Samples was arrested, he came to witness' place and asked him if he remembered him driving him home on the night of the 30th of November, and witness said he did not know the date of that drive.

Barney Davis, ex-sheriff of Custer county, testified that he was acquainted with the general reputations of George Lama, Carl Samples, and John Samples for truth and veracity, and their reputations were bad.

Tom Hudgins testified that he was acquainted with Jim Smith and C. E. Near, and on the 1st day of December, 1910, he met them at a sale near Colony.

H. W. Morrison testified that he knew the reputations of George Lama, Carl Samples, and John Samples for truth and veracity, and their reputations were bad.

To the same effect was the testimony of George E. Lindley and Walker Moore.
said:

Mack W. Litzman testified that he had a talk with George Lama after Jim Smith was arrested, and Lama

"We have got to drag him in if we want to clear John Samples." "No, Jim is not guilty of the charge any more than you are." And, "Jim is not guilty. John Samples never got them, because Carl and I led them away."

C. L. Gasseway testified that he talked with Eddie Keyes about the Smith case, and Keyes said:

"We had to turn against Smith." "Old man Samples offered me $100 to swear against him, and I called Jim

up and told him that if he would furnish me enough money I would get out of the country, and that Samples had offered him $100, and that in Smith's preliminary he (Keyes) had sworn to lies against Smith."

Ed Davies testified that he was city marshal at Weatherford; that he was acquainted with the general reputations of George Lama, John Samples, Carl Samples, and Eddie Keyes for truth and veracity, and their reputations were all bad.

Tim Murphy testified that he was in Weatherford on the day that the mules were stolen that night; that he saw Carl Samples, John Samples, and Near together; that they were on horseback and were going south.

Edna Crume testified that she was court reporter for the county court, and as such took the testimony at the preliminary trial of Jim Smith, and afterwards correctly transcribed the same; that George Lama, as a witness, testified in part as follows:

"Q. State whether or not you had any conversation with Jim Smith or John Samples regarding John's case, wherein he was convicted for stealing the mules from the Colony Mercantile Company. A. I don't know that I did. Q. State whether you ever heard them talk about it? A. Yes, sir; I heard them talk about it, but I don't remember what they said about it."

James H. Smith, as a witness in his own behalf, testified that he had been a resident of Custer county for about 14 years, the last four a resident of Weatherford; that his age was 43 years; that he lived with his family, consisting of a wife and three children; that John Samples was his partner in the livery business for about five months; that Samples sold his interest to Ed Austin in July, 1910, but after that was about the barn often; that

on the afternoon of November 30th he made a drive with C. E. Near, the International Harvester man, getting back about 6 o'clock; that after supper he went back to the barn, and Mr. Near came in about 8 o'clock and arranged his route for a drive the next day; that Mr. Near remained there until about 10 o'clock; that he walked with him to the Park Hotel, and then went on home; that that evening Mr. Casey came in and hired a team to take him home; that John Samples was there and drove Mr. Casey home; that Mr. Casey did not pay, and he charged the same to him on the book that evening; that the next morning he found the man working at the barn and John Samples there; that he drove Mr. Near south; that about four miles west of Colony they met Mr. Dickens, and he told about the mules having been stolen; that he was not acquainted with W. M. Griggs or Leroy Griggs, witnesses who testified for the state, and that he was interested in John Samples' defense because he thought he was innocent, but did not know until Samples' trial that Samples had anything to do with getting the mules out of the country.

The transcript of the testimony contains about 600 pages, but the foregoing statement is sufficient for the purpose of this opinion.

*Jones & Bashore, Geo. T. Webster,* and *James Shackelford,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

DOYLE, P. J. (after stating the facts as above). The plaintiff in error has assigned a large number of errors on the record, but the view we are constrained to take of this case will render it unnecessary for us to pass upon all the questions presented.

The first contention is that the court erred in refusing to grant a change of venue.

The petition was verified by the defendant. It is alleged in the petition that the minds of the inhabitants of Washita county are so prejudiced against the defendant that he cannot obtain a fair and impartial trial in said county; that John Samples, the principal witness for the state, was convicted in Washita county in 1910, and that on his trial this defendant was a witness for John Samples, and the people of the county have become greatly biased against this defendant on that account; that the Anti-Horse Thief Association of Washita county took an active part in the prosecution of John Samples; that its members at the time formed a great dislike to this defendant, and said organization has employed J. W. Smith, of Cordell, ex-county attorney of Washita county, to prosecute him and has paid a large fee to him in the case; that the organization has 175 members scattered over the county; that they are men of high standing and the case has been widely discussed, and it has had the effect of prejudicing the minds of the inhabitants to such a degree that he cannot obtain a fair and impartial trial in said county, and in support of the petition he filed the affidavits of 27 other citizens of the county. The state called ten witnesses in resisting the application.

It has been the uniform holding of this court that the granting of a change of venue is, under the statute, a matter resting within the sound discretion of the trial court, and, unless it clearly appears that there is an abuse of such discretion, this court will not reverse the judgment for a failure of the trial court to grant a change of venue. Considering all of the facts and circumstances

disclosed by the record in the present case, we cannot say that the court erred in refusing to grant the change.

The next assignment is that the court erred in overruling the defendant's motion for a continuance.

The case was called for trial October 13, 1913. Thereupon the defendant filed his motion for a continuance upon the ground of the absence of Ted Bailey, a material witness, and in support thereof relied upon his affidavit setting forth that on the 6th day of October, the time the case was set for trial, he caused a subpoena to issue, which subpoena was therewith exhibited; that said witness lived at Weatherford, and the judge of the district court ordered a subpoena to issue for said witness, with others, directed to the sheriff of Custer county; that the return of the officer showed that Ted Bailey had not been served; that the defendant had exercised all due diligence to find said witness, who was temporarily absent from Weatherford, as affiant verily believed; that the defendant expected to prove by said witness "that Carl Samples, a witness for the state, told him six or seven weeks ago, while he (Carl Samples) was in jail at Arapaho, that he (Carl Samples) and George Lama were the ones who stole the Colony Mercantile Company's mules, and that it was not John Samples and James Smith who stole them, and that this case is a put up job on James Smith, and affiant further says that the said witness, Carl Samples, will deny that he so stated to Ted Bailey, as he verily believes."

It has been the uniform holding of this court that the granting or the refusal of a continuance is largely a matter within the discretion of the trial court, and no rule is more firmly established than that this court will not reverse a judgment of the trial court upon the ground that

it refused to grant a continuance, unless it appears that such court has manifestly abused its discretion in refusing it.

The evidence upon the trial shows that said absent witness was at the time in the adjoining county of Caddo. The defendant's affidavit does not disclose such diligence on his part to procure the attendance of this witness as the law required, or such as made it the duty of the court to grant a continuance. It follows that the motion was properly overruled.

Numerous errors are assigned on the rulings of the court in the admission of certain testimony over the defendant's objections. The court permitted the witness John Samples to testify as follows:

"Q. Was Jim Smith on your bond? A. Yes, sir. Q. Now, John, in the trial of that case, you may state whether or not there was any testimony produced by you and Jim Smith in your defense that was perjury testimony, and known to be so by you and Jim? A. Yes, sir. Q. You may state to the jury just how you and Mr. Smith arranged the defense of your case; state all about it. A. Well, he come and told me what all he could prove and who he could prove all this by. He told me he would get Mr. ————, an attorney of Oklahoma City, to beat the case; Mr. ———— drew a draft for $50 on Mr. Smith, and he turned it down. Smith said that he would get George Lama and Eddie Keyes as witnesses for me, and we got George Lama and Eddie Keyes, and we took turn about drilling and coaching them what to swear to."

Eddie Keyes, over the defendant's objections, was permitted to testify to conversations with the defendant Smith and John Samples about what his testimony would be by way of establishing an alibi for Samples in his case.

George Lama, over the defendant's objections, was permitted to testify that John Samples and the defendant Smith wanted him to swear that he was at El Reno with Samples so as to establish an alibi for Samples.

Carl Samples, over the defendant's objections, was permitted to testify that the defendant Smith tried to hire him to testify as a witness for his brother, John Samples. The testimony of this character and kind takes up many pages of the record.

Counsel for the defendant moved the court "to withdraw from the consideration of the jury all of the testimony of John Samples, Eddie Keyes, George Lama, and Carl Samples with reference to the matter of framing up a defense for John Samples in his case, for the reason that the same is incompetent, irrelevant, and immaterial, not a part of the *res gestae,* and tending in no way to corroborate the witness John Samples as an accomplice." Which motion was overruled, and exceptions allowed.

We are of the opinion that this testimony was inadmissible, because, if true, it had reference to a separate and distinct crime, that of subornation of perjury on the trial of John Samples, and its admission could not have been otherwise than prejudicial to the defendant.

Evidence of an offense other than the one charged is admissible only when it tends to prove the offense charged. To be competent and admissible, it must have some logical connection with the offense charged. The case was tried by the state upon the theory that the defendant Smith had personally assisted John Samples in taking the mules. That is the testimony of John Samples. The defendant made his defense against that theory. John Samples, a confessed accomplice, had to be corroborated.

Apparently, this testimony was admitted by the court under the theory that it tended to corroborate John Samples. Under the state's theory, the defendant Smith was either in Colony on the night of the theft assisting John Samples, or he was not guilty. The efforts of the defendant to help John Samples make his defense about a year after the theft in no way tend to prove that he was with Samples at Colony when the mules were stolen. The testimony of John Samples, Eddie Keyes, and George Lama in this regard raised a collateral issue for the jury. Before the jury could consider this testimony even in corroboration of John Samples, they in effect had to find the defendant Smith guilty of subornation of perjury; but, if the defendant had been on trial for this grave offense, it would have been the duty of the court to instruct the jury that they could not convict the defendant upon the uncorroborated evidence of said witnesses, for by their own testimony they were accomplices of Smith in the commission of the crime of subornation of perjury. We are also of the opinion that the letters written by the defendant to John Samples were inadmissible; they contained no admission against interest, nor any statement that could in any way be construed as an admission of guilt.

The next assignment is misconduct of the attorney for the state in asking certain questions upon the cross-examination of the defendant, and error of the court in permitting the same.

It appears from the record that upon his cross-examination he was asked the following questions and was forced to answer them over his objections:

"Q. State whether or not you stopped at Parsons, with a woman whose reputation for chastity was bad and not related to you? A. No, sir. Q. Did you take with

you any woman of unchaste character when you went to Kansas City? A. No, sir. Q. Did you sleep with any woman while you were there other than your wife? A. I did. Q. At that time you had a wife and two or three children. A. I had a wife and two babies; yes, sir. Q. Now, I will ask you if it is not true that these boys and you and others kept women there at your livery stable and in the hotels at Weatherford and slept with them various and sundry nights? A. No, sir. Q. Did you and these boys ever keep girls around your livery- stable and in the hotels? A. No, sir; I didn't. Q. Did you know anything about having performed an operation on any of these girls? The Court: Objection sustained. Gentlemen of the jury, with reference to the operation you will disregard that question."

The general rule is that, when the defendant in a criminal case voluntarily takes the stand as a witness in his own behalf, he has all the rights of other witnesses and is subject to the same rules of cross-examination and impeachment as other witnesses. *People v. Dupounce,* 133 Mich. 1, 94 N. W. 388, 103 Am. St. Rep. 435, 2 Ann. Cas. 246; *Harrold v. Territory,* 18 Okla. 395, 11 Ann. Cas. 818; *Buxton v. State,* 11 Okla. Cr. 85, 143 Pac. 58.

In the case of *Hopkins v. State,* 9 Okla. Cr. 104, 130 Pac. 1101, Ann. Cas. 1915B, 736, this court said:

"As to what is the proper practice on cross-examination of witnesses, the general rule is that the party cross-examining should be confined to the matters concerning which the witness has been examined in chief; but this rule should be liberally construed so as to permit any question to be asked on cross-examination which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or to test his accuracy, memory, veracity, character, or credibility. This must neces-

sarily include impeaching questions, although they·may relate to matters independent of the questions testified to in chief.

"When the cross-examination is directed to matters not inquired about in the principal examination, its course and extent are very largely subject to the control of the court in the exercise of a sound discretion; and, unless it affirmatively appears that this discretion was abused, the rulings of the trial court will not be reviewed on appeal."

And see *Castleberry v. State,* 10 Okla. Cr. 504, 139 Pac. 132.

Discussing the scope of cross-examination, Mr. Greenleaf says:

"There may, secondly, be a limitation based on the general impropriety of ·allowing an unrestrained raking-up of the witness' misdeeds and of thus making the witness box a source of annoyance and terror both to reputable and disreputable persons alike. The utility of such exposures is comparatively so small, and the abuse of such cross-examination by unscrupulous counsel is so common, that some measures of restriction are highly desirable, and this attitude of the courts may well be emphasized as the only proper one. The object is attained in most jurisdictions by declaring the trial court to have discretion to set limits to such an examination (irrespective of its relevancy), and to forbid it whenever it seems to be unnecessary or profitless or undesirable; and such is the rule now in vogue in the majority of jurisdictions. A few courts, with· courage and wisdom, 'have taken the step of forbidding entirely such cross-examination as to character." (Greenleaf on Ev. vol. 1 [16th Ed.] par. 461b.)

Our statute permits the proof of a prior conviction of a defendant in a criminal case for the purpose of affecting his credibility. Section 5046, Rev. Laws 1910. This proof

may be made either by the record or by the cross-examination of the defendant, and cross-examination as to other separate and distinct transactions and offenses is not permissible, unless such testimony tends to prove the commission of the offense charged, and should in general be limited to matters pertinent to the issue, or such as may be proved by other witnesses.

We are of the opinion that the cross-examination objected to was improper and highly prejudicial to the defendant, and the action of the special prosecutor in asking such questions constituted misconduct on his part. The obvious purpose and the undoubted effect of such course of cross-examination was to degrade the defendant and prejudice the minds of the jury against him, and the rulings of the trial court in permitting the same and compelling the defendant to answer such questions constitute prejudicial error.

Several errors are based upon the exceptions taken to the instructions given and the refusal of the court to give certain requested instructions. Among others, the defendant requested four instructions based upon the law applicable to the impeachment of witnesses, including an instruction approvel by this court in the case of *Nelson v. State,* 3 Okla. Cr. 468, 106 Pac. 647. The charge of the court did not include any instruction covering the law of impeachment.

In view of the fact that two of the state's witnesses were convicts, serving their terms, and that several of the state's witnesses were confessed perjurers, and were impeached by testimony showing that their general reputation for truth and veracity was bad, and that no attempt was made to contradict these character witnesses in any

way, we think the court should have instructed the jury on the law applicable to the impeachment of witnesses, especially in a case of this kind, where the testimony relied upon to secure a conviction was, at most, only technically sufficient to support a verdict of guilty.

For the reasons stated, we think the defendant has not had a fair and impartial trial.

The judgment of the lower court is therefore reversed.

ARMSTRONG and MATSON, JJ., concur.