# GEORGE PRESSLEY et al. v. STATE.

No. A-9774. April 16, 1941.

(112 P. 2d 809.)

Mathers & Mathers and Judd Black, all of Oklahoma City, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendants, George Pressley and James T. D. Williams, were convicted in the district court of Oklahoma county of the offense of robbery. The punishment was left to the court, who thereupon sentenced each of the two defendants to serve a term of five years in the State Reformatory; and they have appealed to this court.

The defendants have filed a lengthy brief in which they present 32 assignments of error.

After a review of the record, it is evident that most of the assignments of error are wholly without substantial merit.

Among the contentions of the defendants, we find only three of sufficient importance, which, when considered together, require a reversal of this case:

(1) The alleged confessions of the defendants were inadmissible as a matter of law.

(2) Admission of evidence of other crimes having no connection with the offense charged.

(3) The misconduct of the county attorney in asking improper questions and making ex parte statements in the presence of the jury, inferring guilt of other crimes to the defendants, was so flagrant that the defendants did not receive a fair and impartial trial.

In order to properly discuss these questions, a short summary of the evidence is presented.

In the state's case in chief, three witnesses were presented: Betty Harbolt, aged twelve; Lizzie Harbolt, her grandmother; and John Butler, a police officer.

Betty Harbolt testified she lived with her grandmother in Oklahoma City. That W. W. Harbolt, the police officer, is her uncle. That on January 7, 1939, about 7:30 p. m., she and her grandmother were walking along in the 1400 block on West Third street; two boys, a tall boy and a short boy, walked up and one of them asked what hundred block that was. "I told them it was the 1400 block." One of the boys then grabbed her grandmother's purse, which witness was carrying. Witness tried to hang onto the purse, and was knocked down. They jerked the purse away from her and ran. She identified the defendant Pressley as being the person who snatched her purse; and further testified that the Pressley boy lived in the next block to her, but that she had never seen him before.

On cross-examination the witness denied making statements to various parties, in which she said that it was so

dark that she was unable to identify either of the boys who assaulted her.

Lizzie Harbolt testified that she and her granddaughter had been to Chapman's Grocery Store to get some groceries, and were returning home. That she had $5.50 in her purse, which the granddaughter was carrying. That when they got down close to Mrs. Boone's store, two boys stepped out from behind a tree and grabbed the purse that Betty had. That Betty wrestled with them until she fell to her knees. The taller boy hit her twice; and then they got the purse and ran to the alley back of Boone's store, and went west. That this happened at night, but it was light enough that she could see their faces. She identified the two defendants as the two boys who committed the assault.

On cross-examination she testified that Wayne Harbolt, a police officer, is her son and that he arrested these boys. That about three days after the boys were arrested, she came down to the city jail and identified them. That one of the boys was taller than the other. She further testified:

"Q. Didn't you say there at the Boone store that it was so dark that you couldn't identify either one of them? A. I don't know what I said in there. Q. You were so badly scared you don't know what conversation you had with Mrs. Boone? A. I don't know what I said in there, because I was scared and nervous."

She stated that she left the Boone store and went to Chapman's store in the next block.

"Q. Didn't you tell all of them that it would be impossible for you to identify either one of these boys right then and there? A. I just couldn't tell you what I told them. Q. You were so badly frightened you could not tell what you said? A. I went back and told Mrs. Chapman

the other day that I was ashamed of myself the way I done."

John Butler testified that he is a police officer of Oklahoma City, and has been for nine years. That in January, 1939, he was attached to the Detective Division and worked with W. W. Harbolt. He and Harbolt arrested the defendants in their home on this charge on January 27th, and took them to the police station. The witness then identifies two exhibits offered by the state, which were alleged confessions of the defendants. Upon proper objection being made by the defendants, the jury was excluded from the courtroom and testimony taken upon the question of the admissibility of the confessions. Butler testified that he was present when the defendants each signed the respective statements bearing their signatures. That no threats were made or promises given to induce them to sign the statement, but that they were voluntarily signed. He admitted the boys were taken separately into the "consultation room," where the alleged offense was discussed with them, but denies that the defendants were either assaulted or whipped or threatened in any way *to his knowledge.* He further testified that the boys were kept in jail for four days without permitting their folks or an attorney to talk to them, until on the fourth day a writ of habeas corpus was procured from District Judge Giddings, at which time the charges of robbery were filed against the defendants.

He further testified:

"Q. Were you in there at the time Mr. Harbolt was talking to Pressley? A. Part of the time, yes, sir."

As to the defendant, Williams, he testified:

"I wouldn't say that I was or I was not there when he was brought out of the cell to be brought to the 'consultation room,' or whatever you want to call that office

of ours; but I was there just before he sat down and gave his statement to the clerk, Jack Mackey."

George Pressley, one of the defendants, testified that he had signed the statement to keep Harbolt from killing him. That Harbolt took him into a room by himself, said that a purse had been stolen from his mother, and stated: "You did it." "I told him I didn't do it, and Harbolt hit me on the chin and knocked me down, and made me stand up and then slapped me back down, and said: 'You see that blood down on the wall by the chair? That is what we do to them. I am going to stomp your God-damned guts out right here on the floor. You snatched my mother's purse.' " That he was in a room without any windows, and that there was blood on the wall. That Butler was not in the room. That he was knocked down by the officer three times before he told the officer that he would sign a statement. That the officer then took him out before the clerk, and the officer dictated the statement, and he signed it to keep from being beat up any more. That after he was taken to the county jail, he was brought down to the county attorney's office and told both Mr. Marlin and Mr. Morris about what Harbolt had done to him; and also called for Mable Bassett and had her come to the jail and told her the same thing. That he is now 18 years of age.

James Williams testified that he is now 17 years old. That he was arrested on this charge on January 27, 1939, and taken to the police station. That Officer Harbolt took him into a room and took a big book and read where a little girl had been knocked down and her money taken, and he said:

"Do you know anything about that?" "I said, 'No.' He said: 'You son of a bitch, you did it.' He took me to a little room with no windows and nothing else, and just two chairs, and said: 'Go on and tell me everything, and

I will be your friend and let you off easy.' I said that I didn't have anything to say, and he went out and came back in, and said the other boy signed a confession blaming it all on me. I said I didn't believe he did. He asked me if I smoked, and I said, 'No.' He gave me a cigarette, and I told him that gave me a headache, and he started blowing it in my face and told me he was going to stomp the God damned s——t out of me if I didn't confess; and he told me, with the suspended sentence, he would send me down for life or to the electric chair; and it scared me and I signed it."

The defendant Williams further testified that the officer struck at him once, and that he ducked and was not hit. That the statement is false, and would never have been given if he had not been scared of his life by what Harbolt said to him. That there was nobody present but Harbolt when he told him that. That they kept him in jail and would not allow him to talk to anybody for four or five days, until a writ of habeas corpus action was filed.

After these witnesses testified, the defendants, through their counsel, announced, "That is all." The state then announced, "That is all."

The court evidently had the correct view of the matter at that time, as the record shows that he addressed the county attorney as follows:

"The Court: Is there anything further? Here is the man here they say did the beating? (Indicating Harbolt, the policeman.) Mr. Black: Comes now the defendants separately and jointly and introduce their objection, and let the record show, that this witness, after the rule having been called for and invoked, has remained in the court room and has remained in the presence of this testimony before the court and in chambers. The Court: The rule was put on and it was said at that time that this man would not be called as a witness. He has been in the court room and has been right here, but I am going to let him testify. Mr. Marlin: If they want to object, that is all right with

us. I don't want to ask him anything in the face of their objection. * * * The Court: All right. There is a conflict in the testimony here, and it will be for the jury to determine under proper instructions. The purpose of taking this testimony was to see whether there was a conflict. There is a conflict, and it is a matter for the jury to determine under proper instructions whether there was any force or threats. Mr. Black: To which the defendants except, and the defendants and each of them request the court at this time to sustain the objection that they have made. The Court: Overruled and exception."

The jury was recalled. The policeman, Butler, resumed the witness stand; again identified the confessions and the circumstances under which they were made in substantially the same manner he had testified before the court.

After the objections by the defendants had been overruled, the assistant county attorney (Mr. Marlin) read their statements to the jury. In reading the confession of the defendant Williams to the jury, the defendants interposed an objection to the following statement which appeared in the confession:

"Mr. Marlin: (Reading) 'At this time I am out on a five year suspended sentence for car theft, and at the time I was picked up, I was picked up with George Pressley, James Neiler, Madison Cobb, in a 1937 Ford coupe, which we had stolen from Geary, Okla.' "

The objection of the defendants to that portion of the statement, on account of it attempting to prove another crime not related to the offense charged against the defendants, and at the time when the defendants' character had not been made an issue, was overruled and exception allowed.

In the statement of the defendant, Pressley, appeared the following quotation: "I was also picked up once in a

stolen car, stolen from Geary, Oklahoma, long with James Williams, James Neiler and Madison Cobb, of 1500 block N. W. 1st.", to which a similar objection was interposed by the defendants, and the objection was overruled and exception saved.

After the introduction of these statements, the state rested its case. On behalf of the defendants, their defense was in the nature of an alibi. Each of the defendants placed on the witness stand several witnesses who testified that they were at another and different place than the robbery at the time it occurred.

The owners of the Boone and Chapman grocery stores, together with four of the clerks, also testified on behalf of the defendants that Betty Harbolt and Lizzie Harbolt, each, stated at their stores right after the robbery occurred that it was so dark that they were unable to identify either of the parties who committed the offense. At that time they stated that one was taller than the other and had on a jacket. The defendants stood up in the court room, and the record shows that they were about the same height.

As to the admissibility of a confession made by a defendant, this court in the case of Howington v. State, 35 Okla. Cr. 352, 250 P. 941, stated:

"Where the competency of a confession is challenged on the ground that, if made, it was not voluntary, its admissibility is primarily a question for the court. In the absence of the jury, the court should hear the evidence offered respecting the facts and circumstances attending such alleged confession, and the burden is on the defendant to show that it was procured by such means or under such circumstances as to render it inadmissible, unless the evidence on the part of the state tends to show that fact. If it is held competent, and proof of the same admissible, the defendant is entitled to have the evidence in regard to the facts and circumstances under which it was made

given anew to the jury, not that the jury may pass upon its competency or admissibility, but for the purpose of enabling them to judge what weight and value should be given to it as evidence, and the jury may disregard it if they are not satisfied that it was voluntarily made."

In the case of Lucas v. State, 26 Okla. Cr. 23, 221 P. 798, it is stated:

"Confessions induced by a promise of benefit or a threat of harm made to a defendant by a prosecuting attorney or an officer having him in custody will be deemed involuntary, and will be inadmissible in evidence."

"Where the competency of a confession is challenged on the ground that it was not voluntary, its admissibility as evidence is primarily a question for the court, which should be determined by the court in the absence of the jury; but the defendant is entitled to have the evidence in regard to the facts and circumstances under which the confession was made given anew to the jury—not for the purpose of permitting the jury to pass upon its competency, but for the purpose of enabling it to judge what weight and value should be given to it as evidence. The jury may disregard it if they are not satisfied that the confession was voluntarily made."

See, also, Mays v. State, 19 Okla. Cr. 102, 197 P. 1064; Miller v. State, 13 Okla. Cr. 176, 163 P. 131, L. R. A. 1917D, 383.

As Mr. Wharton has stated:

"The real question is, whether there has been any threat or promise of such a nature that the prisoner would be likely to tell an untruth, from the fear of the threat, or hope of profit from the promise." Wharton, Cr. Ev., 9th Ed., 658.

As a general rule, all confessions are prima facie admissible in evidence. Unless an objection is interposed, the practice has been to receive confessions without question. If an objection to the admissibility of a confession

is interposed by the defendant, a question of law is presented to the court and should be determined in the absence of the jury, preliminary to allowing the confession to go to the jury. The burden is on the defendant to show that it was procured by such means or under such circumstances as to render it inadmissible, unless the evidence on the part of the state tends to show that fact.

The trial court, in ruling upon the question of law which was presented to him, stated: "There is a conflict in the testimony here, and it will be for the jury to determine under proper instructions."

There may be a conflict in the testimony, and yet the trial court could find that the confessions were improperly obtained and inadmissible. Where a direct conflict appears in the evidence as to whether the confessions were voluntary, trial courts generally have adopted the practise of submitting the facts and circumstances surrounding the giving of a confession to the jury; not that the jury may pass upon its admissibility, but for the purpose of enabling them to judge what weight and value should be given to the confessions as evidence, and the jury may disregard it if they are not satisfied that it is voluntary.

The error that arises here is in the assumption by the court that there is a conflict in the evidence as to whether the confessions were obtained by force or threats. It is true that Officer Butler testified that there were no force or threats to his knowledge. But he also testified that Officer Harbolt talked to the defendants in the "consultation room" when he was not present. The two defendants, as hereinabove set forth, testified positively that Harbolt threatened and abused them; and each of them testified that at the time the threats and abuse occurred they were alone in the torture room with Harbolt. The only person

who could testify and present a conflict in the evidence as to what occurred is Officer Harbolt, and he was not used as a witness. The defendants did not contend that threats or abuse were used at the time the statements were signed, but that they had been abused in the torture chamber before they were taken before the clerk and Butler to sign the statements.

The county attorney in the hearing before the court on the admissibility of the confessions did not offer Harbolt as a witness; and the court stated at the conclusion of the evidence upon that proposition: "Is there anything further? Here is the man here they say did the beating."

The attorney for the defendants arose and objected to Harbolt testifying, for the reason that he had not been placed under the rule. The court properly overruled that objection, as that is a question which only goes to the weight to be given to the testimony of the witness and does not affect the admissibility of his evidence. But after the court had overruled the objection of the defendant to Harbolt testifying, the county attorney still refused to place Harbolt on the witness stand.

Another significant incident in connection with the contention of the defendants that they were beaten and abused in connection with the securing of the confession is the testimony of the defendant, Pressley, that he told Mr. Marlin and Mr. Morris in the county attorney's office what Harbolt had done to him, and had called for Mable Bassett and related to her about the beating which he sustained. None of these parties refuted his statements, although Mr. Marlin, the assistant county attorney, was sworn as a witness and testified in connection with another incident, which occurred during the trial.

Under the record before the court, at the time an objection on behalf of the defendants was interposed to the admissibility of the confessions, the confessions were inadmissible as a matter of law, for the reason that there is no evidence to dispute the testimony of the defendants that they were abused by Policeman Harbolt at a time when Butler was not present.

Objection was made to the admission in evidence of that part of the statement signed by the defendants, in which the defendant, Williams, stated that he was out on a five years' suspended sentence for car theft; and the defendant, Pressley, had stated he was also picked up once in a stolen car, along with James Williams, James Neiler, and Madison Cobb.

It is a fundamental principle of law that the character of the defendant cannot be impeached or attacked by the state unless he puts his character in issue by introducing evidence of good character; also, that evidence of offenses other than the one charged is admissible only when it tends to prove the offense charged. To be competent and admissible, it must have some logical connection with the offense charged.

See, Flynn v. State, 68 Okla. Cr. 72, 96 P. 2d 96; Kirk v. State, 11 Okla. Cr. 203, 145 P. 307; Smith v. State, 14 Okla. Cr. 348, 171 P. 341.

In Flynn v. State, supra, this court stated:

"In the fifth paragraph of the syllabus of Smith v. State, supra, the court stated:

" 'Section 5046, Rev. Laws (1910), 12 Okla. St. Ann. § 381, permits the proof of a prior conviction of a defendant in a criminal case for the purpose of affecting his credibility. This proof may be made either by the record or by the cross-examination of the defendant, and cross-examination as to other separate and distinct transactions

and offenses is not permissible, unless such testimony tends to prove the commission of the offense charged, and should in general be limited to matters pertinent to the issue, or such as may be proved by other witnesses.'

"In Cline et al. v. State, 57 Okla. Cr. 206, 47 P. 2d 191, in the first paragraph of the syllabus, this court stated:

" 'Conduct of prosecuting attorney in persistently cross-examining the accused by assumptions and insinuations as to previous unlawful acts and transactions, in spite of rulings against him, held improper and prejudicial.'

"In the third paragraph of the syllabus of Cline et al. v. State, supra, the court stated:

" 'It is the trial court's duty to uphold the guaranty of a fair and impartial trial to all persons whether innocent or guilty.'

"In the body of the opinion in Cline et al. v. State, supra, the court said:

" 'It is a fundamental principle of criminal law that the character of the defendant cannot be impeached or attacked by the state, unless he puts his character in issue by introducing evidence of good character. Kirk v. State, 11 Okla. Cr. 203, 145 P. 307.' "

In Jones v. State, 20 Okla. Cr. 154, 201 P. 664, 670, this court held:

"It is not admissible to show the bad character of the defendant until after the defendant himself puts his good character in issue, and then only by showing his general reputation, and not by particular acts. Evidence of other criminal acts not in issue in the case should be excluded; such testimony has a tendency to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the charge at issue, or to take proof of it as justifying the defendant's condemnation, irrespective of his guilt of the crime for which he is being tried. Moreover, the use of alleged particular acts, ranging over the entire period of the defendant's life makes

it impossible for him to prepare to refute the charges, any or all of which may be mere fabrications. The rule as above stated has received the judicial sanction of the courts of this country for more than a century. Underhill on Evidence, § 82; 1 Wigmore on Evidence, 233; 10 R. C. L. 953; Porter v. State, 8 Okla. Cr. 64, 126 P. 699; Corliss v. State, 12 Okla. Cr. 526, 159 P. 1015."

It is improper to ask a witness if he has ever been indicted, arrested or imprisoned, before conviction, for any offense whatever. Where such question is asked, it should be promptly excluded, with a rebuke to the lawyer asking the same; and if the question is repeated, it should be treated as a contempt of court and punished as such. Porter v. State, supra.

In this connection it appears that Mr. Marlin, the assistant county attorney, repeatedly asked improper questions concerning other acts allegedly committed by the defendants. Some of these questions were addressed to other witnesses who were testifying for the defendant.

The following is a typical example: The witness, V. C. Head, testified that he was employed by the Chapman Food Market, and testified as to a statement made in that store by Mrs. Harbolt immediately after the robbery. No other questions were asked about any other matter on direct examination. On cross-examination the record discloses the following:

"Q. (By Mr. Marlin) Did you hear about Raymond Fillinger and this boy Williams, and this boy here taking this pistol (indicating) and robbing a drugstore boy on a man's porch just about a year ago? A. No, sir. Mr. Mathers: Just a minute. Now, let us get the record. We object to that as seeking to put the defendants' character and reputation in evidence when it is not in evidence. It is a violation of the constitutional rights of the defendants and every principle of law that has ever been rendered since the inauguration of this government. The Court:

I will sustain that. Mr. Mathers: And we ask that the county attorney be reprimanded. I never heard of such a thing. The Court: Wait a minute. I am going to instruct the jury to disregard the question and the answer to it. Don't pay any attention at all to it in this case. * * * Mr. Black: We further move that this purported gun be put back out of the sight of the jury. The Court: All right. Mr. Marlin: I will put it away."

The record later shows that the pistol which Mr. Marlin held up before the jury at the time this question was asked was a wooden pistol which the state contended had been painted black by Raymond Fillinger and the defendant Williams, for the purpose of committing another crime not in any way connected with the offense charged.

Evidently the assistant county attorney allowed this wooden pistol to remain on the counsel table in view of the jury, and afterwards referred to it repeatedly in his examination of defendants.

Without going into detail and setting forth the testimony in every instance, it is sufficient to say that the record discloses many different occasions when the assistant county attorney (Mr. Marlin) injected improper and prejudicial statements into the record; and on most of the occasions objections to his remarks were sustained by the trial judge. However, the damage was done, and the effect of continually asking these unfair questions could not be cured by the sustaining of objections to the questions.

Take, for instance, the county attorney asked many of the witnesses, who were neighbors of defendants and who testified for the defendants, this question: "Q. How many robberies have occurred in that immediate neighborhood within a block of where you live?" At another occasion, in cross-examining alibi witnesses, he would ask this question of these witnesses who were laymen: "Q.

You didn't file any notice in this lawsuit that the defendant would be at another place other than his home or where the robbery occurred?" This question was repeated three times to one witness, no doubt, for the purpose of intimating to the jury that the witness himself had failed to do something which the law imposed on him as a duty and, therefore, was testifying falsely.

At another place, the county attorney asked one of the alibi witnesses for the defendant:

"Q. You didn't have a family reunion or a marriage or anybody die? Mr. Black: We object to that as incompetent, irrelevant and immaterial. Mr. Marlin: This is the first lawsuit I ever saw when they didn't have that. The Court: Sustained and stricken."

At another time, he asked a witness, who lived in that neighborhood, if somebody didn't get robbed and slugged in that block every week.

Mr. Williams, the father of one of the defendants, testified that he had suffered an injury in which his arm had been broken; and that on the night in question, not being able to drive his car, he had his son drive his car for him. In his examination, the witness was asked the condition of his arm; and the following occurred:

"A. I think it is pretty bad, myself. Mr. Marlin: It will stay bad until we get through with this lawsuit. Mr. Black: We object to that as incompetent, irrelevant and immaterial. The Court: Sustained and jury instructed to disregard it."

At another time, on cross-examination of the defendant Pressley, Mr. Marlin had some letters identified as State's Exhibits Nos. 4, 5, and 6. These letters were allegedly written to Pressley by one Raymond Fillinger, who at that time was living in California. These letters were allegedly lost by the defendant, recovered by some unknown party, and delivered to the police officers. The

record discloses several questions asked by the county attorney of the defendant Pressley, over the objections of the defendants' counsel, concerning these letters, and what Raymond Fillinger had stated in them. After some argument between counsel over the various questions asked of the defendant, the following occurred:

"Mr. Mathers: We object to that as incompetent, irrelevant and immaterial, any reference to any letters. He would not be bound by the action of a third person. The Court: That will be sustained. Q. (By Mr. Marlin) Do you have any idea now how the officers figured out that you and James committed that robbery? Mr. Mathers: We object to that as calling for a conclusion of the witness and reading the minds of the officers. The Court: Well, I don't know. He might know. I don't know what he knows. Overruled. Mr. Mathers: Exception. The Witness: I don't know what they could get out of the letters that would make them want to pick me up. Mr. Mathers: That was not the question. The Witness: Will you state the question? Q. (By Mr. Marlin) You say you don't know what they could get out of the letters? A. Will you state that question again? (Previous question read by the reporter.) The Witness: No, sir. Q. (By Mr. Marlin) Well, he told you, skipping a couple of portions, to get on out to California, didn't he? Mr. Mathers: Now, your Honor— The Court: That is sustained and the jury instructed to disregard it."

Many pages of the record were used in the examination concerning these letters and a code used by Fillinger in writing to the defendant. The court at the beginning overruled the objections of defendants; this evidence of what some one supposedly wrote Pressley is inadmissible, and the only purpose it could serve would be to prejudice the jury towards the defendants.

At another time, these questions were asked:

"Q. (By Mr. Marlin) Did you know about this black gun? A. No, sir. Q. Were you with George Pressley and

454

Raymond Fillinger the night he tried to rob the boy upon the porch? Mr. Black: Just a minute, now— The Witness: I don't know anything about that. Mr. Black: We object to that as incompetent, irrelevant and immaterial. The Court: Sustained."

Objections were sustained by the court to this question, which was asked in substantially the same form many times, but the county attorney persisted in asking the question, and trying to impress on the jury the fact that the defendants were guilty of committing many offenses other than the one for which they were on trial.

The court, however, allowed the county attorney, in his cross-examination of the defendant Pressley, to question him at length concerning the alleged plan of Pressley and Raymond Fillinger to rob a drugstore messenger boy, and to cross-examine both defendants as to whether on the night of January 12th they were attempting to burglarize a D-X filling station. Both of the defendants denied that they had planned or attempted either of these two alleged offenses.

In rebuttal, the state introduced the testimony of Police Officers Ridley and Jeter, who testified over the objection of the defendants that they arrested the two defendants at the D-X filling station on January 12th, at which time one of the boys had a screwdriver which he threw away when the officers drove up. That when the officers approached, the defendant Pressley was unscrewing a screw to the window. That the boys were released the following morning without any charges being filed. All of this testimony was irrelevant on the question of the guilt or innocence of the defendants on the particular offense charged, as no connection whatever is shown between these alleged offenses and the offense upon which the defendants were being tried. It is elementary that a wit-

ness cannot be impeached upon collateral matters; and it is error to permit the defendant, as a witness in his own behalf, to be cross-examined as to any distinct collateral fact, not brought out in the examination in chief, to the view of impeaching his testimony by introducing other witnesses to contradict him. Whether the matter inquired of on cross-examination of the defendant and proved by the state in attempting to impeach him was collateral to the issue must be determined by this inquiry: Would the prosecuting attorney have been permitted to introduce it in evidence as a part of the state's case? If he would not, it was collateral. If it was collateral, it was not competent to contradict it. See Payne v. State, 10 Okla. Cr. 314, 136 P. 201.

As was stated in Flynn v. State, supra:

"We are of the opinion that this testimony was inadmissible because, if true, it would refer to a separate and distinct crime; and its admission cannot be otherwise than prejudicial to the defendant."

In view of the fact that this case will have to be retried, it is our opinion that, if upon a new trial a conflict in the evidence appears as to the circumstances under which the confessions of the defendants were obtained, so as to justify the submission of the confessions to the jury as hereinabove set forth, the court should eliminate from the confessions all reference (1) to the alleged stolen car from Geary, Okla., and the suspended sentence which the defendant Williams received in connection therewith; (2) the Raymond Fillinger incident in connection with the alleged plan to rob the drugstore messenger boy; (3) the alleged attempted burglary of the D-X filling station. The fact the defendants made statements relating to these three occurrences in their alleged confessions does not render them admissible; and no evidence concerning them

should be admitted either in reading the confessions to the jury or upon cross-examination of the defendants, if they should take the witness stand in their own behalf, with the exception that the defendant Williams may be examined concerning his conviction of the offense of stealing the automobile, which under the rules of evidence may be admitted for the purpose of affecting his credibility. If the defendants ask that the witnesses be placed under the rule, the police officers, as well as the lay witnesses, should be excluded from the courtroom, as the sheriff's office should be amply able to look after the prisoners if they are not at liberty on bond.

After consideration of the entire record, we hold that the defendants were not accorded a fair and impartial trial as guaranteed to them by the Constitution and laws of this state; and for the reasons herein stated, the judgment of the district court of Oklahoma county is reversed, and the case remanded for a new trial.

BAREFOOT, P. J., and DOYLE, J., concur.