# ELIJAH KIDD v. STATE.

No. A-10074.   March 31, 1943.

(136 P. 2d 210.)

Bill Mounger, Jack Cecil Wheeler, Everett F. Capshaw, and Glenn O. Morris, all of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, P. J.   The defendant, Elijah Kidd, was charged by information duly filed in the district court of Logan county with the crime of murder, was tried, convicted and sentenced to death, and has appealed.

The information, in substance, alleged that the defendant, Elijah Kidd, and one Allen Anderson, without authority of law and with a premeditated design to effect the death of one Henrietta Jackson, did drive, operate and propel a 1936 model Ford V-8 coach against the body of the said Henrietta Jackson, then and thereby inflicting certain mortal wounds from which said wounds the said Henrietta Jackson did die on January 2, 1941.

Fred Streeter, Chief of Police at Guthrie, testified that early in the morning of January 2, 1941, pursuant

to a call, he went to the 300 block on South Capitol Hill street in the city of Guthrie and there found the deceased, a colored woman, lying in the center of the street; that the body was in a pool of blood. He gave a description of the road at that point and testified to facts which indicated that the body had been struck and dragged about 20 steps. Some ornaments off of a car were found close to the body. A broken radiator ornament was found in the road with some hair matted in it and other pieces were scattered about. The body was taken to a funeral home in Guthrie and there held until the night of January 9th, when it was identified by one Walter Davis who had been brought to Guthrie by two colored officers from Oklahoma City. That on January 10 he saw the defendant Kidd in the detective bureau in Oklahoma City. That defendant, in the first conversation had with witness, related that he had insurance on the life of Henrietta Jackson, payable to himself as beneficiary, and defendant further stated that he had hitchhiked to Guthrie and was there on New Year's Eve, but specifically denied knowing anything about the killing. That he brought the defendant to Guthrie and took him by the funeral home to view the body of the deceased. That when defendant saw the deceased he said, "That's Henrietta", and that defendant raised his right hand and further stated, "I ask God to strike me dead if I had anything to do with this." That the next morning the defendant told the witness that he was ready to sign a confession about the killing but that he would not say that he shoved the deceased in front of the car. The witness notified the county attorney that defendant desired to make a confession and he was taken to the county attorney's office, where the proof showed that the defendant gave a statement which was taken in writing and

afterward signed and sworn to by the defendant. This statement is as follows:

"State of Oklahoma ) ss
"County of Logan ) 

"Elijah Kidd, of lawful age, being first duly sworn upon his oath, states:

"I am also known as Reverend and Preacher Kidd. I have been warned by County Attorney Hugh J. Adams in the presence of Chief of Police Fred Streeter and Officer Allen Fields that anything that I say may be used in evidence against me and that I do not have to make a statement. I have been informed that I am entitled to have a lawyer present. I make this statement freely and voluntarily without being promised anything whatever. No force, fear or violence has been used on me and I am making this statement because it is the truth.

"About October 1, 1940, Freddie Adams, Walter Davis and I planned to kill Henrietta Jackson so I could collect her $700 insurance which was made out to me. The deal was that I was to pay them $300 a piece and keep $100 for myself. They said the policy would pay more than $700. They said if I didn't let them do the job they would tell on me . That is, if anyone else killed Henrietta they would tell about the insurance unless they got $300 a piece. About the last of October we made plans to kill Henrietta at Dunbar school on East Sixth street in Oklahoma City. We never put this plan in effect, however, since we couldn't get together on how to divide the money. They wanted $600 and I wouldn't consent to give them that much. I agreed to split it four ways but they wouldn't agree to this. The fourth one was Allen Anderson, but they didn't know this.

"Later on New Year's day Allen Anderson and I made our plans to kill Henrietta Jackson. We talked the deal over on our way to Guthrie in Anderson's car, a 1936 V-8 Ford. We left the city around 3:30 or 4 o'clock p. m. and arrived in Guthrie about 5:30 p. m. We decided to do the job at night. We thought we would visit in

Guthrie with Luke Ballard and Lela Ellis. We decided we would do the job that night and split the insurance money 50-50. We decided we would kill Henrietta Jackson around 12:30 or 1 o'clock a. m. January 2, 1941. We decided we would get Henrietta in the car and drive around until we found a suitable spot and then he would nudge me. Then the plans were that I was to get out of the car with Henrietta and he was to drive around the block and when he came back around I was to shove her in front of the car.

"When we got in to Guthrie we visited the Ballards. Mrs. Ballard is my wife's aunt. We visited them for a while and left about 7:30 or 8 p. m. We took Luke Ballard, Mrs. Ballard and Maureen and Maxine with us and visited the colored school and listened to a concert by the colored highschool band. After the concert Anderson and I took the Ballards home, then we visited the skating rink, where they were having a colored dance. We paid a dime a piece to get in. We went there about 10 p. m. and stayed there about 30 minutes and then went back to Oklahoma City. We got back to the city about a quarter to 12. We went to my house at 1506 Drury Lane and picked up Henrietta Jackson. We waited just long enough for Henrietta to change her clothes. Then we—that is, Anderson, Henrietta Jackson and I—drove back to Guthrie in Anderson's car, arriving in Guthrie about a quarter to 12 at night. We drove around Guthrie for about five minutes, and then when we got to where Henrietta was killed Anderson nudged me and I said to Henrietta, 'We better get out here.' She said 'All right.' Then Anderson drove south to the corner and turned right then to the right again and drove two blocks north and then one block east and turned south again so he would have two blocks to gain speed. Anderson gunned the motor and must have been making around 60 miles an hour when he approached Henrietta and me. Just as the car was about ten feet away I shoved Henrietta in front of the car. The car struck her dead center and sucked her in. Then she fell and was drug by the car, I can't say how far.

"I got Henrietta Jackson to get out of the car and wait with me because she wanted to meet Joe Armstrong, that is the young Joe Armstrong. She had seen his picture and wanted to meet him. I told her that he would be by there.

"After the car struck Henrietta I went out to where the body of Henrietta was and called her name twice. She didn't answer and had been hit with such force that I was certain she was dead. I got in the car with Anderson and we started for Oklahoma City. We didn't drive very fast, as we didn't want to arouse suspicion. We stopped at one of the last stations on the east side of Division street as we were leaving Guthrie. We drove past the station and stopped and drove back north to the station's drive and got some water in the car. I don't know the man that waited on us. We then turned back south and drove out Highway 77 to Britton. I can point out the station where we stopped. Just before we reached Britton, we stopped and Anderson looked over the car. He said the grill was bent and the hound on the radiator was gone. He said, 'I've got to get off the street with this car.' He drove me on home arriving there about 3 p. m. Then Anderson went on home. Anderson told me that he left the car that night parked in front of his home at 536 East Second street. He said he got up early the next morning and took the car to a garage. I don't know where he got it fixed. He said it cost him $12. He called me up and asked me to borrow the money, but I told him I didn't have it. Anderson's car was a two-door Ford V-8, colored black. The grill was bent in and the radiator ornament, which had a hound dog fastened to it, was knocked off when Henrietta was hit.

"I had not been drinking and neither had Anderson or Henrietta.

"Elijah Kidd

"Subscribed and sworn to before me this 11th day of January, 1941.

"(Seal)   Irene McClellan, Notary Public   .

"My commission expires:  Feb. 15, 1941.

"Witnesses: Allen Fields
"Fred Streeter
"Hugh J. Adams
"Samuel K. Abrams."

Dr. P. B. Gardner testified that he examined the body of Henrietta Jackson after her death. His investigation disclosed a fracture of the base of the skull, a fracture of the left arm above the wrist and that there were bruises and skinned places over her whole body, but worse on the left hip, both legs and the left shoulder. That in his opinion the deceased had met her death by reason of a blow at the base of the brain which fractured her skull.

B. C. Combs, justice of the peace, testified that shortly before daylight the morning of January 2, 1941, he was called to the 300 block on South Capitol Hill street to view the body of deceased. That she was lying with her face buried in a puddle of blood; her hair was matted with blood. That when he raised her head blood ran out of her mouth, nose and ears. That he found by her side a large man's handkerchief with 80 cents in it; that one of her shoes was lying on the left-hand side of the street and the other on the right-hand side. That the physical evidence showed that the deceased had been struck by an automobile and dragged about 25 steps to where she was lying when he saw her. That he made an official report as coroner after his investigation and his docketed report was that she had been killed by being struck by an automobile driven by an unknown driver.

R. C. Sutton testified that he was a salesman for the Washington National Insurance Company. That he met the defendant on September 3, 1940. That defendant stated he had a friend who didn't carry any insurance and that he would take out a policy on her and pay it himself. That he did make out an application for insur-

ance on Henrietta Jackson for a $375 policy. That the application was cut down by the office to $300, the premium payable at 20 cents a week. The defendant was named as the beneficiary in the policy. This policy was in force at the time of the homicide.

S. E. Myers testified that he was Superintendent of the National Life and Accident Company in Oklahoma City. That his company issued a policy of life insurance in the sum of $400 on Henrietta Jackson on September 2, 1940. That the policy was delivered to Elijah Kidd and he was named as the direct beneficiary. That the defendant Kidd paid the premiums on this policy.

John Miller testified that he was employed by the Simpson Auto Company in Oklahoma City. That on January 2, 1941, the codefendant, Allen Anderson, left a 1936 V-8 Ford coach at the garage for repair of all the fenders and the radiator grill. At the request of Anderson he put in a used grill, a new radiator ornament and straightened the right half of the hood. He identified the piece of a broken ornament removed from the Anderson car and upon being shown the broken ornament found by the officers at the scene of the slaying the record discloses that the piece of ornament found by the officers fitted the broken piece removed from the car by the mechanic.

Some other officers testified for the state, but their testimony was corroborative of that of the witnesses hereinabove set forth.

Lula Huddleston testified that she was defendant's sister. That defendant, in a conversation with her the day he was arrested, but before his arrest, asked her to phone Henrietta Jackson's grandmother at Perry, Okla., and tell her to go to Guthrie and identify the body of

Henrietta Jackson, but that she refused to do so. That she suggested that defendant do the calling and defendant said, "Henrietta had her beneficiary made to me and you know how people talk."

Walter Davis testified that he had known the defendant about 10 or 11 years. That he had always known him as "Preacher." That on December 10, 1940, he and Freddie Adams went to Elijah Kidd's house. That Elijah Kidd and Adams went to the bathroom and closed the door and had a conversation which he could not overhear. That Adams told him he was making arrangements with Elijah Kidd for a deal and that they were to meet again on December 17th. Upon being asked to describe the matter of the deal, the court sustained an objection by the defendant. That after the meeting with Kidd and Adams on December 17th the witness went to a deputy sheriff in Oklahoma City, and related what occurred. That the deputy sheriff told him to go back and talk to Kidd and get more of the details. That he and Adams returned to Kidd's house about 8 or 8:30 p.m. on December 17th. That Kidd and his wife and the deceased, Henrietta Jackson, were present. That he and the defendant Kidd and Adams went out of the house and got into Adams' car. That defendant stated, "I have a proposition and we can all make some money out of it," and further stated: "I have got a policy on a girl, and it is made to me, it pays $300 for natural death and $600 accidental death, we can collect this money, and if we put her away for $100 we will have $250 apiece left. I says 'What is your plans to dispose of her?' And the defendant said, 'Take her out on the road over here and make it appear it was a hit-and-run driver.'" The witness further testified: "I says to Kidd—in the meantime, this officer asked me if I knew the person named and I didn't. And I says to

Kidd, 'How do I know you have a policy on this lady, that you are not just killing her for a grudge?' And he says, 'I will show you the policy from the Washington National Insurance Company.' " That he and Adams and Kidd drove around for quite awhile That they drove out east of Oklahoma City and Kidd picked out a place and suggested that they run over her there, as it would look like it was accidental. That he and Adams objected and later they picked out a place on East Fourth street in the 1400 block which Kidd thought was ideal, as it was dark and downhill. That Kidd said: "When we bring her out here, you put me out on this corner and you go around the block, here, a block or two, and come back and have plenty of speed because I want to be damned sure she is dead. I says, 'What excuse have you got to her to have her out here that time of night', and he says, 'She is in love with some boy by the name of Joe', which could have been a ficticious name—'some boy by the name of Joe who lived in Guthrie, and I told her time after time I would bring her out to meet this boy and I will tell her we are waiting on Joe, and you can go around a block or two and come back and give a long honk', and I objected to that, I didn't want him to push her out in front of the wrong car. I says, 'Anybody driving an automobile and see people standing by the road are liable to honk,' and I says, 'I will honk three times', and he says 'All right.' And we took Kidd back to Nichols Hills and asked him what time to pick him up and he said at 12:30, and we left." That the witness came back and reported what had happened to the officers, but upon objection by defendant he was not allowed to relate what the officers said or did upon being given the information. That when he heard of an unknown negro woman being killed by an automobile he came to Guthrie in company

of two negro officers from Oklahoma City and identified the body of the deceased at the funeral home at Guthrie.

The witness further related that the deputy sheriff wanted him to talk to the county attorney about Kidd's proposal and that he stalled Kidd off a night or two while he was waiting to see the county attorney to see what the county attorney wished him to do. That finally he could not get the officers to do anything and he told Kidd that he had backed out and would not help him with his plan.

The defendant testified in his own behalf that he was 36 years of age; a cook by trade; that he had formerly been a minister but had quit preaching seven or eight years ago; that he had been living in the servants' quarters in Nichols Hills, adjacent to Oklahoma City, for about a year and a half prior to his arrest on January 9, 1941. The defendant told of the chief of police coming from Guthrie to Oklahoma City after him and related that on their way back to Guthrie the officer asked him, "Ain't you going to sign," and he stated, "I didn't kill her, but I was with her when she got killed." That the officer said, "You are a damned liar," and struck defendant in the mouth. That he was placed in jail at Guthrie and mistreated by the officers who were trying to get him to confess. That a highway patrolman who was there at the jail stated: "I'll take these handcuffs and knock your damn brains out." That after he was brought down to the county attorney's office he was not mistreated and that he did not tell the county attorney about the officers mistreating him. That he gave the county attorney the confession and signed it because he was still scared from the way the officers had treated him. That the officers told him when they were taking him to the county attorney that if he did not act right they were going to

take him back to jail and "whip hell out of him." The defendant then related that he and his codefendant, Allen Anderson, came to Guthrie the night of the killing and went to a dance for colored people. That when he returned home Henrietta Jackson, the deceased, was at his house. That she was drinking and that he and Anderson and Henrietta drank a pint bottle of whisky. That deceased wanted another pint of whisky and he went after it. That deceased got to insisting on going to see Joe and they drove down to Guthrie. That they drove around awhile and he saw that the deceased was pretty drunk and he suggested that they ride around until she got sober. That they were driving around over the streets of Guthrie and the deceased jumped on him and commenced fighting him. That he told Anderson to stop the car and let him get out with Henrietta and see if he could walk her around until she got sober. That he got out of the car with the deceased and Anderson drove off to get some water at a filling station. That while Anderson was gone the deceased got to hitting him and while they were scuffling he saw Anderson returning in the car. That he tried to pull Henrietta off the road but she hit him with her purse and turned and started to run across the street and was struck by the car. That he did not shove her or push her in front of the car. That Anderson stopped after he had struck her and examined her body and saw that she was dead. That he and Anderson were nervous about what to do and that they decided the best thing that they could do was to go home and not tell anyone. He denied having the conversation with the witness Walter Davis, but admitted that Davis came to his house with Fred Adams but denied that he talked to them at all about killing the deceased.

It is first contended that the court committed error in overruling the defendant's motion for continuance on account of the absence of one Charley Hawkins, an alleged witness of defendant. The motion for continuance alleges that a subpoena was duly issued for the witness on February 10, 1941. It does not allege that the subpoena was served by the officer nor does the motion allege the present whereabouts of the witness, nor does it state any facts from which the court could conclude that the defendant might reasonably expect to have the witness present to testify at the next term of court. It does allege that the subpoena was issued for the witness at 2 North Klein street, Oklahoma City. The affidavit recites that the witness was present on the street and saw the occurrence which resulted in the death of deceased. The facts which it is alleged the witness would testify are substantially the same as those related by the defendant in the trial.

At the time this motion was presented no proof was offered in support thereof, and it was overruled. Later during the trial and at the close of the testimony of defendant the testimony of certain witnesses was introduced both by the state and defendant in connection with the absence of this alleged witness. It appears that the court issued an attachment for this witness and a deputy sheriff went to the place of residence named in the motion and an investigation in that neighborhood disclosed that there were no parties who knew of the witness Hawkins. The deputy sheriff to whom the original subpoena was given also testified that he had been unable to find anyone by that name. The original subpoena was identified and it does not bear the indorsement of the district judge directing the appearance of an out-of-county witness which

would have been necessary in order to have compelled his appearance even if he had been served.

The subpoena was not issued until February 10th, just seven days before the trial date.

The county attorney cross-examined the defendant concerning his information that the witness Hawkins would substantiate his story of the details surrounding the killing. In this examination the defendant could not remember the name of the man who had told him of the witness Hawkins, whether he was a blonde, brunette, or how he was dressed, and his testimony in general tends to support the contention of the county attorney that the affidavit concerning the witness Hawkins was interposed as a subterfuge in an effort to delay the trial.

In Simmons v. State, 68 Okla. Cr. 337, 98 P. 2d 623, we stated:

"No person is obliged to attend as a witness, before a court out of the county where the witness resides or is served with the subpoena, unless the judge of the court in which the offense is triable, upon an affidavit of the county attorney, or of the defendant or his counsel stating that he believes that the evidence of the witness is material and his attendance at the trial necessary, shall indorse on the subpoena an order for the attendance of the witness."

"An application for continuance on account of the absence of a witness must show diligence has been used to procure the witness or his testimony."

"In reviewing the refusal of an application for continuance on account of absence of a witness, the testimony taken at the trial is considered by this court for the purpose of determining whether the absent testimony was probably true, as well as whether it was material, if true."

In the recent case of Presley v. State, 76 Okla. Cr. 120, 134 P. 2d 595, decided February 24, 1943, it is stated:

227

"A motion for continuance on the ground of absence of material witnesses should state the facts with reference to the present whereabouts of the witnesses and the grounds of the expectation that the witnesses would be present at the next term of court, so that the court may determine from an examination of the instrument whether it is reasonable to expect that the witnesses could be procured for attendance at the next term."

After a thorough consideration of the record with reference to this contention, it is apparent that the court did not abuse his discretion in refusing the application for a continuance.

It is next insisted that the court erred in allowing a confession made by defendant to be introduced in evidence for the reason, as contended by defendant, that the same was obtained by duress, fear of bodily harm, and a promise of mitigation as to the sentence to be imposed.

Confessions made because of threats against the accused or through fear of bodily harm are inadmissible as evidence. Pressley et al. v. State, 71 Okla. Cr. 436, 112 P. 2d 809; Mays v. State, 19 Okla. Cr. 102, 197 P. 1064; Lucas et al. v. State, 26 Okla. Cr. 23, 221 P. 798.

The defendant gave oral statements to several parties concerning the details of the slaying and he signed a written statement in the county attorney's office, a copy of which has been hereinabove set forth. When the county attorney first commenced to question a state's witness concerning a statement made by defendant, counsel for defendant interposed an objection. The jury was excused and the court heard the testimony of several witnesses. The jury was recalled and without the court making a ruling on the admissibility of the alleged statements the trial proceeded without any objection on the part of counsel for defendant. Later some of the witnesses testified at length concerning defendant's statements as to all of

the events surrounding the homicide. Never during any of this testimony was there an objection interposed that the statements made by defendant were not voluntary. The original objection which was made when the jury was excused was a general objection that the evidence was incompetent, irrelevant, and immaterial and was not an objection that the alleged statements were involuntary. Later, after testimony at length had been given concerning the various oral statements of defendant, the county attorney offered in evidence the written confession executed by defendant. Then, for the first time, counsel interposed the objection that the confession was involuntary. The written confession was merely a repetition of the statements which had been detailed at length by the witness Streeter without objection.

The defendant testified that one of the officers struck him and threatened him with bodily harm if he did not confess. He admitted, however, in his examination, that there were no threats directed at him while he was in the county attorney's office, but that on the other hand the county attorney treated him very nicely, but he related that he signed the confession because of his fear that harm would befall him when he was taken back to jail unless he did make the alleged confession. All of the testimony of the officers and other parties directly contradicted the testimony of the defendant that any threats or duress were used or promises made to the defendant to induce him to make a confession.

The court submitted to the jury for their consideration the circumstances surrounding the execution of the statements, both oral and written, claimed to have been made by the defendant. No complaint is made concerning this instruction and we find that it thoroughly covers the established law on this question.

In Pressley et al. v. State, supra [71 Okla. Cr. 436, 112 P. 2d 813], it is stated:

"Where the competency of a confession is challenged on the ground that, if made, it was not voluntary, its admissibility is primarily a question for the court. In the absence of the jury, the court should hear the evidence offered respecting the facts and circumstances attending such alleged confession, and the burden is on the defendant to show that it was procured by such means or under such circumstances as to render it inadmissible, unless the evidence on the part of the state tends to show that fact. If it is held competent, and proof of the same admissible, the defendant is entitled to have the evidence in regard to the facts and circumstances under which it was made given anew to the jury, not that the jury may pass upon its competency or admissibility, but for the purpose of enabling them to judge what weight and value should be given to it as evidence, and the jury may disregard it if they are not satisfied that it was voluntarily made."

A close examination of the record discloses that there is very little discrepancy between the statements of the defendant as related by the officers and the testimony of the defendant as given in the trial. The defendant relates substantially the same state of facts on the witness stand as were detailed by the witnesses for the state with the exception of what transpired at the moment of the actual killing. And in connection with defendant's written confession as to the actual killing, he did not claim that he made this part of the statement under duress, but merely denied remembering having made such a statement. The trial court proceeded correctly in admitting the confessions in evidence and submitting the facts and circumstances surrounding them to the jury for the purpose of enabling them to judge what weight and value should be given them as evidence.

It is next contended that the court erred in refusing the defendant's requested instructions asking the court to submit the issues of manslaughter in the first and second degrees.

The instructions of the court should only cover the issues which are presented by the evidence, but they should cover all issues presented whether by the evidence of the state or defendant. The state contended that the defendant and Anderson killed Henrietta Jackson under a preconceived plan in order to secure the benefits of two insurance policies. The defendant claimed that he did not kill Henrietta Jackson. His testimony on this point is as follows: "She was fighting and when the car approached she hit me and I hit her and then she throwed the pocket book at me and she went to run across the street when this car struck her." The defendant denies that any act of his was in any way responsible for her death. If the jury had believed the testimony of the defendant, it could not have convicted him of any crime. If they believed the testimony of the state, then the defendant was guilty of murder. Under the evidence the verdict necessarily must have been that of guilty or not guilty of murder. The jury was evidently thoroughly convinced that defendant and his codefendant had deliberately planned and cruelly perpetrated the slaying, as they found him guilty and assessed the extreme penalty. Since there was no evidence which would have justified the giving of manslaughter instructions, the court properly refused to give them.

This being a homicide case with the penalty of death attached, this court has given the whole record the extraordinary and careful consideration which the seriousness of such a case demands.

There is some claim made by counsel for defendant in their brief that the punishment should be modified to life imprisonment. With this contention we cannot agree. This court may not exercise its powers to modify a judgment unless we can say from a review of the whole record that justice demands a modification and that the penalty assessed was probably arrived at by reason of passion or prejudice. The jury was fully justified in arriving at the verdict which they reached, and we have found nothing in the record which would justify us in modifying the punishment imposed to life imprisonment. It was a coldly executed, premediated murder to satisfy the defendant's greed for money. The defendant had no more regard for the life of the deceased than if she had been a stick or stone or any other inanimate object. This unlawful homicide is just such an offense at which our statute authorizing the infliction of capital punishment is directed. A human life has been wantonly and brutally taken by defendant and this court would not be performing justice or discharging the grave responsibility which rests upon us if the sentence of death was modified.

The judgment and sentence of the district court of Logan county is accordingly affirmed.

The date originally appointed for the execution of the defendant Elijah Kidd having passed pending this appeal, it is ordered, adjudged and decreed by this court that the judgment and sentence of the district court of Logan county be carried out by the electrocution of the defendant Elijah Kidd by the Warden of the State Penitentiary at McAlester, Oklahoma, on Tuesday, June 15, 1943.

BAREFOOT and DOYLE, JJ., concur.