# GRAY v. STATE.

No. A-11741.  April 29, 1953.

On Rehearing July 8, 1953.

Second Petition for Rehearing Denied July 15, 1953.

(258 P. 2d 950.)

Wm. H. Lewis, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Sam Oliver, Assistant County Attorney, Oklahoma County, Oklahoma City, for defendant in error.

POWELL, P. J.   The plaintiff in error, Ulishes Gray, was charged by information in the district court of Oklahoma county with the crime of murder, was tried before a jury, convicted, and the jury being unable to agree on the amount of punishment to assess, left the same to the court who fixed a penalty of 30 years in the State Penitentiary at McAlester.   Appeal has been perfected to this court.

While some fourteen specifications of error are set out in the petition in error, they are argued together under four main heads.

It is first asserted that "the trial court should have sustained a demurrer to the evidence * * * and have directed the jury to return a verdict of not guilty at

the conclusion of all the testimony, for the reason that the State did not introduce any proof whatsoever to show that the defendant was not acting in self-defense."

We shall therefore first consider the sufficiency of the evidence. The state offered the evidence of twelve witnesses.

From the evidence in general, it appears that the deceased, Elmer Rogers, as well as the defendant, were Negroes; that the deceased occupied a room at the Terminal Hotel on California street, in Oklahoma City; that he had no regular occupation and was somewhat addicted to gambling; that the defendant was quite regularly employed by builders or construction companies as a laborer, but he also liked to gamble.

Charlie Tabb, colored and 46 years old, testified that he was then employed as a farm laborer at Frederick, Oklahoma, but on July 2, 1950, he occupied room No. 218 at the Terminal Hotel in Oklahoma City. Witness admitted that he had served three terms in the state penitentiary for grand larceny and also for pandering; that he served 49 months altogether, and had been out for about four years. He stated that on July 2, 1950, between 1 and 2 o'clock in the afternoon, he was in front of the Terminal Hotel and the defendant, with whom he was acquainted, came up as witness was entering the hotel, touched him on the shoulder and asked him if Elmer Rogers was there, or if he had seen him. He stated: "I told him I seen him a while ago. I don't know. Ask the girl at the desk. She can probably tell you where he is." He stated that the defendant came on into the hotel with him and the girl told him she thought Elmer Rogers was upstairs and that the defendant, whom he referred to as "Smokey", followed witness upstairs; that room 220, occupied by the deceased, had the door open a little and there was a light on. Witness further testified: "When Smokey gets there, he goes up and knocks on the door and then Elmer tells him, 'Come on in, man.' * * * I goes to my room, straight to my room."

Witness denied seeing any knife in the defendant's hand at that time. He testified that after going to his room, 218, which was close by 220, he heard an argument. Said he:

"A. I heard him say 'Man, give me my twenty dollars. What did you go off with my twenty dollars for?' They starts arguing so I goes back to the room. I comes away from my room. The door was open and I walks in. That was when I stops them and I knocks Smokey's hand down. Q. Did Smokey have a knife at that itme? A. He had a knife at that time. My jacket gets cut, so he stops it. Elmer jumps back and grabs the door on the north side and throws it open. Q. Now, you say there was another door in there? Was that a door between two different rooms? A. * * * he jumped back and throwed it open. That was when I got my jacket cut. I said, 'Stop it. We have got to live here.' I says, 'Elmer, what is the matter?' Smokey was over to one side then. Elmer speaks up and said, 'This is a business proposition. Go on ahead and we will take care of it.' He had three or four dollars laying there. He says, 'This is all of the money I have got.' Q. Who said that? A. Elmer. They went to talking, see what I mean? They went to talking, so I goes on out and goes back and starts to my room. At that time, I hears them arguing again and they was fighting this time. I goes back in. Q. Did Smokey say anything? A. Smokey done asked him, 'Give me my twenty dollars.' That was all I could hear him say, was 'Give me my twenty dollars.' Q. All right. A. I got to the door and they was fighting, and that was when Smokey hit him and I saw the blood. Q. What did he hit him with? A. A knife. He had a knife in his hand. Q. Did Elmer have a knife? A. I didn't see any knife. Q. How was Elmer dressed? A. He had on his underclothes. He had on his shorts and shirt. Q. Go ahead. A. And so they was fighting, and so I couldn't stand all of that blood, so I turns and walks down stairs to the desk where the girl was. Q. All right. Let's go back

up to the room again. How many times did you see Smokey hit him with the knife? A. I seen him hit him once. I don't know how many times he hit him, but he hit him right up in here (indicating). This is where I seen him hit. That was all I seen. I don't know how many times he was cut because I disremember, but I seen him hit him up here, right up in the left shoulder up here."

Witness testified that he had the girl at the desk downstairs call an ambulance and that he went out on the street to tell "a bunch" of people about the fight. He further testified:

"Q. All right. How long after that was it before he [Smokey] came down? A. It was longer than you would think. It was about ten minutes, I would say about ten minutes. He come down stairs and come outside and he was on the street there for about five minutes, and then he starts back in the door and I stopped him. He says, 'I am going back.' I says, 'For what?' I says, 'If I was you, I would let him alone.' He said, 'I want my hat.' I says, 'I will go get your hat.' Q. You said that? A. Yes. I said, 'don't go back up there bothering that boy.' So, Smokey went down the street, down in front of the pool hall. He just stood there. He just kept standing there and directly he come back and asked me the second time. I said, 'I will go and get your hat.' I goes up there and gets his hat. I asked the girl, 'Have you called an ambulance?' I said, 'That boy is up there bleeding to death.' Q. Did you see Elmer when you went back after Smokey's hat? A. Yes, sir. Q. Where was he? A. He was sitting on the top step and was leaning against the banister. Q. Was he bleeding then? A. He was about unconscious then. Q. All right. A. (Indicating) He fell that way, but he didn't fall right then. He was just sitting there. * * * Q. Where did Smokey go after you came back up stairs? A. Smokey was standing down there in front of the pool hall and a horn blowed and he went and got out in the car. Q. He went to a car? A. Yes; he got in a car and left. Q. Did he leave then? A. He left then."

After this testimony there were further questions and answers as follows:

"Q. What did Smokey say then? A. All I could hear was the argument about the twenty dollars. Smokey said he took his twenty dollars and the boy said, 'I don't have but four or five dollars', or something. He wanted to know why he wanted to leave with his money. He said, 'Why did you want to leave with my twenty dollars? Don't you know I will kill you', or something like that about 'my twenty dollars.' Q. Did you ever see Elmer Rogers with a knife up there, a gun or anything? A. No. Q. He did not have anything? A. No; I didn't see anything."

On cross-examination witness Tabb reiterated the testimony given on direct examination, and further admitted that he saw one Jesse Yarsant, commonly known as "Bad Jesse", outside the hotel between it and a nearby Chinaman's Cafe, and that three or four other persons were out there with him.

David Morrell testified, but his evidence merely corroborated the fact that Elmer Rogers was found on the second floor of the Terminal Hotel bleeding badly from cuts, and that he saw the defendant coming down the steps.

Willie Clarence Morrell testified that he was an employee of the Milner Hotel; that he had been arrested a few times for drinking and gambling, but for nothing else; that on July 2, 1950, he was asleep in room 214 of the Terminal Hotel, which was two or three doors away from room 220; that he heard loud talking in room 220 and got up and dressed; that he heard Smokey Gray asking Elmer Rogers for his money. Said he: "Smokey said, 'You know not to mess with my money. I will kill you." He further testified: "And just as he went down stairs, I didn't get to see Smokey go down stairs, just the back of him. I never saw him before in my life anyway. Elmer was standing there at the door and was trying to get to the telephone. He fell and I went on down stairs." He stated that he saw Smokey down stairs with a pocket knife and that the blade was bloody. That one of Smokey's hands appeared to be cut.

124

Edward Christian testified that he was 26 years of age, and married, and had never been in jail. That on Sunday, July 2, 1950, he drove his '37 Master Chevrolet car down on California street and parked. That Charlie Tabb, Jesse Yarsant, known as "Bad Jesse", sat in the car with him. That he saw an A B C cab drive up and saw Elmer Rogers pay the driver, get some bills back and go to his room. That later Smokey Gray came to the car and asked them if they had seen Elmer Rogers and witness anskered "No"; that Yarsant got out of the car and commenced leading Gray past the Chinaman's Cafe, and that Gray had a knife in his hand, and Yarsant tried to persuade Gray that Rogers had gone to the east side. He further testified that Charlie Tabb got out of the car, that Tabb had a paring knife in his hand and he ran over and grabbed Gray by the arm and said, "I will take you up to his room"; that a few minutes later Smokey and Tabb came back to the car and Smokey had blood all over the front of his jacket, and his hand was bleeding. He further testified that Smokey had a bloody knife in his hand; that Tabb told witness to take defendant from the scene and witness refused; that Gray asked Tabb to get his hat and Tabb finally went back up stairs and got it, and gave it to the defendant right in front of the Terminal Hotel; that a colored woman drove up in a '41 grey Buick and the defendant got in and the woman drove away, and that Tabb left running east on California. He stated that Tabb had blood on his pants leg. Witness looked up the stair steps from the lobby of the hotel and saw Elmer Rogers lying there bleeding, but not moving.

J. M. Swofford, photographer for the Oklahoma City police department, testified that on July 2, 1950, he took some pictures of the body of Elmer Rogers for the department, and identified three photographs, No. 1 showing the upper left arm of Rogers and disclosing a long deep cut; No. 2 showing the right side of the head of the victim and disclosing a long and deep gash in the neck; and No. 3 was of the left side of the head and disclosed an ugly cut from under the ear to the junction of the jaw and throat. He stated that he made the pictures at the Rolfe Funeral Home.

Jesse Yarsant testified that he was convicted once for cutting a woman when she was cutting at a man and she ran between them, and three times for automobile stealing; that he was last in prison in 1939; that he had been working for the International Harvester Co. for about six years and was past 58 years of age. He stated that on July 2, 1950, he was in the cafe part of the Terminal Hotel at No. 9 California street, and one Willie Lee Rogers, brother of Elmer, inquired if witness had seen Elmer, which he had not at that time; that about 30 minutes later Elmer Rogers came in with some bills in his hand; that later Smokey, the defendant, came in the back door with a knife in his hand and asked witness if he had seen Elmer Rogers and witness answered "yes" and told defendant that Elmer had gone to the Chinaman's Cafe; that he so stated because he saw the defendant was mad. Witness stated:

"A. He said 'I gave the black son-of-a-bitch twenty dollars to gamble with and he wins the money and then he wouldn't even split the money with me and he wouldn't even give me my twenty dollars back. I am going to kill him anywhere I meet him.' I said, 'Smokey, you are crazy. I wouldn't do that. Listen to me. You listen to me like I listen to you.' He starts off and I grabbed him and he snatched loose from me. I said, 'You are not mad at me, are you?' And he said, 'No, I am not mad at you but don't tell me nothing.' He walked on out of the door and I followed him out of the door. When I got out of the door on to the sidewalk, there was Tabb and this Christian boy and somebody else there in the car. He says, 'Any of you seen Tabb—I mean Elmer?' Tabb says 'Yes.' He says 'Where is he at?' Tabb says 'Up to his room.' I said, 'No, let's go to the Chinaman's.' Q. Smokey was still there? A. Yes. So we started over to the Chinaman's. Tabb run up and pulled him away. He said, 'Come on.'

Tabb had a thin handled paring knife in his hand and a butcher knife, a butcher knife about that long. (Indicating.)"

Defendant's attorney strenuously objected to witness giving voluntary information as to the knives he stated Tabb had and the court admonished the jury not to consider such statements as not responsive to the question asked.

"* * * Q. Go ahead. What occurred there next? A. Well, we started to the Chinaman's Cafe. Q. How far is that from the Terminal Hotel? A. Right next door. Q. All right. A. (continuing) I would say from here to that wall (indicating). Q. Go ahead. A. Just about that time Tabb run up and grabbed him by the arm and said, 'Let's go on up there.' I said to Tabb—Q. Did Smokey still have the knife? A. In his left hand, just like this (indicating). I said, 'Tabb, I wouldn't do that. I wouldn't take that man up there.' I was afraid they would go up there and hurt that man. I said, 'If he has a gun, you would be the first one he would kill.' Tabb said, 'I am going to take him up there.' They went in the hallway and I followed them. They goes up the steps and I goes back outside and in about five minutes Smokey comes down. He comes right straight to me. He says— 'Well', he says, 'He got me but [* * * obscene * * *] him up.' He had a knife in his hand and was bloody all over and it was running down his sleeve. Q. Was he cut up any place? A. Smokey? Q. Yes, Smokey. A. He had a little scratch on his arm here. I said, 'You didn't have to get into this.' He said, 'Don't tell me nothing.' He walked on out of the door and I walked out of the door behind him. He made somebody pick his hat up, I don't know who that was. Q. Somebody picked his hat up? A. Yes. He said, 'You can call the law if you want to.' Q. Smokey said that? A. Smokey said that. He stood there a pretty good while. He walked down to the front of the pool hall and I went on in the cafe and when I come back, he was gone, him and Tabb both. Q. Smokey was gone? A. Yes. Q. Did you go upstairs later on that day? A. I went upstairs. Q. Did you see Elmer Rogers? A. I went up there and he was walking around in his undershirt. He was holding his jaw like this and the blood was just gushing. (Indicating) He kept walking around and around and after a while he sat on the end of that step with his head down and his feet up. Q. His head how? A. His head laying down this way (indicating). He fell down with his head like this with his breast stuck up like this."

On cross-examination witness insisted that he would not tell defendant where the deceased was because he saw that defendant had a knife and was mad. He stated that Charlie Tabb ran up and pulled defendant by the arm and said: "The black son-of-a-bitch is up there in his room. He owes me five dollars. He is up there." He further stated that Tabb had a thin handled paring knife and had a butcher knife, one in each hand. He insisted that Smokey said that he was going to kill Elmer Rogers if he found him. He stated that he stayed down at the cigarette machine, that he did not know what happened to Tabb, but that after a while Smokey came down the steps and said: "Well, he got me, but I [* * * obscene]." Witness claimed that counsel for defendant admonished him as follows: "He said to me, he said, 'If you go up there and say Smokey had a knife that day, I can't clear him.' "

Jack L. Mullenix, police detective, testified that on July 2, 1950, after a call he arrived at the Terminal Hotel at No. 9 West California street in Oklahoma City, around 2:15 or 2:30, and that the ambulance attendant had the body of a man he later learned to be Elmer Rogers on a bed, and he was bloody all over; that he went in to room 220 and found blood on the floor, three one-dollar bills and some change on the dresser; that he searched the room for knives and weapons, but found none.

The coroner, undertaker and another officer testified as to the identity of the body, cause of death, etc., and the later apprehension of the defendant.

There was introduced a signed statement made by the defendant concerning the fight with Elmer Rogers, given to Wayne Harbolt of the Oklahoma City

126

Police Department on July 5, 1950. Defendant told about driving the deceased out on the Spencer Highway on Saturday night preceding the fight on Sunday; about deceased grabbing a $20 bill out of his hand to use in gambling with two colored women, and promising to pay it back; about picking defendant up Sunday and leaving him on Bryant and driving on to Moore on his way to Texas to visit his mother, and then remembering that although Elmer won, he had not returned the $20, and about going to the Terminal Hotel to look for him, and about Charlie Tabb taking the defendant to the deceased. The statement then reads:

"So I walks in and I says, 'Elmer, I wants my money.' He said 'What money?' I said, 'Don't play me to be no sucker, give me my money,' cause I'm going to see my mother and I don't have no time for no foolishness.' He tells me, 'You ain't nothing but a sucker.' He said, 'That's all the money I have you see laying there on that dresser.' He say, 'I don't know anything about any other money, that's all I know anything about.' He said, 'There ain't no use in talking to me about no money,' cause I ain't going to give you a damn thing.' I says, 'Yes, Elmer, you are going to give me my money.' He gets up and goes from the foot of the bed and goes to the head of the bed. He puts his hands behind him under a pillow and come out with a pocket knife and cut at me, and I knocked the lick off with my left hand and started to cutting him. Charlie Taft [Tabb] run in and grabbed me and pulled me out. That was all. Q. Do you know where all you cut him, Smokey? A. No, sir, I just hit him. I know the first lick I hit him in the neck. Q. Had either one of you been drinking? A. He had, I hadn't. Q. How much had he drunk? A. I don't know, but he wasn't drunk. Q. How was Elmer dressed when you went to his room? A. Just in his underclothes. Q. How did Charlie Taft [Tabb] get his shirt and pants cut? A. I don't know how he got them cut. Q. Did you see any money on the dresser? A. Yes, sir. I seen about six or seven dollars, something like that, on the dresser. Q. What kind of knife did you use? A. A bone-handled pocket knife, which I brought to the police station with me. Q. You say Elmer had a knife? A. Yes, sir. Q. What kind was it? A. I couldn't tell you what kind it was. He come up so fast I couldn't tell what it was. Q. Did you get injured in this fight? A. Yes, sir. Q. Where? A. On my left hand. Q. Where did you go after you had cut Elmer? A. I walked out on the street and stayed until Charlie Taft [Tabb] said go ahead on and try to get something done for my hand. Q. Where did you go to? A. I went to I. V. Brooks', 1750 N.E. 4th. I went there and washed my hands and changed clothes and got a bandage for my hand. I stayed there and called the hospital to see how Elmer was getting along. When I left there I went on to visit my mother. I left word if they needed me I would be back Tuesday night. I came in and I called the office and they told me to come down the next morning, and I came. Q. Did you get your $20 during this fight? A. No, sir."

At trial the defendant testified as to the facts of his fight with Elmer Rogers substantially as in the statement made to officer Harbolt. He denied being mad or having a knife in his hand when he went upstairs to see Elmer, but stated that his knife was in his watch pocket and that after Elmer had gotten a knife and cut him on the left hand he grabbed Elmer and they wrestled into an adjoining room and back before defendant got his knife out and commenced striking back at Elmer. Defendant had introduced into evidence a shirt and pair of pants that he claimed he was wearing at the time of the fight. They were cut in several places, and he claimed the cuts were made with a knife wielded by the deceased. Witness denied that any woman drove him away from the scene, but claimed that he got in his car, which was parked nearby, and drove to 1750 N. E. 4th, to the home of I. V. Brooks, got his hand dressed, borrowed $20 from Brooks and drove on to Texas; that the officer in Texas advised him that Elmer Rogers had died and that he had better return to Oklahoma, which he did, reporting to the sheriff's office and they took him to the city officers for questioning. That he gave the knife he used to the officer, which was admitted

but the officers could not find it at time of trial. He admitted seeing Bad Jesse first inside the hotel near the front door, and that he tried to misinform him as to Elmer's whereabouts.

I. V. Brooks testified for the defendant, corroborating his testimony concerning coming to his home to get his hand dressed and to get $20 for the trip to Texas. He stated that the defendant was bloody, that his left hand had been cut and that his pants and shirt had been cut.

The defendant further proved by a Mrs. Willie M. Miller, who testified that she operated a rooming house, that Elmer Rogers had been convicted in court for stealing money from her.

The defense offered the testimony of A. C. Myler, superintendent in charge of identification and records in the Oklahoma City police department, as to arrests and convictions of state's witnesses Tabb and Yarsant. The officer had only a takeoff of the record. The court would not receive this testimony on the ground that evidence of the arrests was inadmissible at all events, and that the oral evidence of the convictions would be hearsay, not the best evidence, and inadmissible as the state had voluntarily admitted and detailed the convictions of the two witnesses when they testified.

The action of the court is assigned as error, but it is determined that any further evidence concerning the convictions, already admitted by the two witnesses, and concerning which they had been cross-examined, would not have been proper, and particularly by the method such proof was sought to be made. Uhlenhake v. State, 58 Okla. Cr. 248, 52 P. 2d 117.

At the close of all the evidence the defense interposed a demurrer, which was overruled. It is now claimed as first herein set out, that the evidence was not sufficient to support the conviction. We believe that a casual reading of the factual situation will refute such contention. It was in the province of the jury to weigh the evidence of the various witnesses, most of whom seem to have had difficulty with the law enforcement agencies, one way or another.

This court has often said that in considering the sufficiency of the evidence, its function is limited to ascertaining whether there is a basis in the evidence on which the jury could reasonably conclude that accused is guilty as charged. Hunt v. State, 81 Okla. Cr. 114, 161 P. 2d 82; Simonton v. State, 94 Okla. Cr. 274, 235 P. 2d 542.

In the case of McMurtry v. State, 81 Okla. Cr. 24, 159 P. 2d 567, 568, this court in paragraph one of the syllabus, said:

"The rule has long been established that this court as an appellate court will not weigh conflicting and contradictory evidence which has been passed on by the jury and trial court, but will interfere only where there is an entire absence of testimony upon some material issue, or that the evidence so clearly preponderates in favor of the defendant, as to suggest the probability that the verdict was the result of misapprehension or partiality."

It is next contended that the court erred in the refusal to give a requested instruction on manslaughter in the second degree. We do not find that the evidence in any way involves the elements of manslaughter in the second degree. Tit. 21 O.S. 1951 § 716. If the jury had believed the witness Yarsant they would have been justified in finding the defendant guilty of murder under Tit. 21 O.S. 1951 § 701 (1). The jury found the defendant guilty of manslaughter in the first degree, apparently under Section 711(2) of Title 21 O.S. 1951, the homicide being brought about without a design to effect death, but by means

of a dangerous weapon. See *Koozer v. State,* 7 Okla. Cr. 336, 123 P. 554, for an excellent treatise on the distinction between murder and manslaughter.

Defendant's theory was that of self-defense. He did not claim the existence of any state of facts indicating negligence, accident or any other element which could have reduced the crime to manslaughter in the second degree, and for such reason the court did not err in refusing to give the requested instruction covering manslaughter in the second degree.

In his reply brief, for the first time complaint is made of Instruction No. 25, reading as follows:

"If you should find the defendant guilty beyond a reasonable doubt, under the evidence and under these instructions, of murder, then you are instructed that the jury must fix the punishment, as provided in the preceding instruction. However, if you do not find the defendant guilty of murder, beyond a reasonable doubt, but do find him guilty, beyond a reasonable doubt, of manslaughter in the first degree, so state in your verdict, and you may then assess the punishment therefor within the provisions of the law set out herein, or you may leave the punishment to be assessed by the court."

Counsel for defendant states:

"The court will observe by reading this instruction that the trial court tells the jury that they may assess the punishment if they found the defendant guilty of manslaughter in the first degree, or the jury may leave the punishment to be assessed by the court. The court does not tell the jury that if they are unable to agree upon the punishment or fail to agree on the punishment, they should so state in their verdict, and leave the punishment to the court."

Further complaint is made that the form of verdict signed, while it showed that the jury found the defendant guilty of manslaughter in the first degree, there was no indication that the jury even tried to reach a verdict as to the amount of punishment to be assessed, but simply found an out by reason of the instruction complained of and the form of verdict submitted to them, and were not cognizant of their duties in the premises but left this task to the court.

It is claimed that the error on the part of the court was fundamental and hence can be raised in this court for the first time. We do not find the error to be fundamental, although we agree with the argument of counsel otherwise. In the case of *Ladd v. State,* 89 Okla. Cr. 294, 207 P. 2d 350, the decisions of this court involving the question raised were reviewed at some length and the correct form of instruction covering the point raised was suggested, and should be followed. But the error could be and was waived. The jury, it is true, as the triers of the facts, and assessors of the punishment, might have assessed the minimum penalty of four years for manslaughter in the first degree, as argued by counsel. But at the same time they might have assessed life imprisonment, or might have found defendant guilty of murder and assessed the extreme penalty of death. But all this is speculative. We are bound by the record as we find it.

The members of this court have among themselves discussed at some length the possible justification from the record, in view of the admitted character of the materiel witnesses having some knowledge bearing on the facts of the homicide, of our authority to reduce the punishment assessed. But we cannot agree from a review of the record that justice demands a modification, and that the penalty assessed was probably arrived at by reason of passion or prejudice. *Kidd v. State,* 76 Okla. Cr. 213, 136 P. 2d 210; *Wooldridge v. State,* 93 Okla. Cr. 245, 225 P. 2d 1028. The taking of human life cannot be treated lightly. The jury viewed the witnesses, heard them, and weighed the evidence; the court also viewed the witnesses and heard them and based on the findings of the jury,

assessed the penalty. We cannot say that the punishment assessed is excsesive. Whatever relief defendant may in the future be entitled to must be earned by his conduct and co-operation in the penitentiary, and the consideration of the Pardon and Parole Board and the Governor. And that is a matter of grace beyond our authority.

The verdict and judgment is affirmed.

JONES and BRETT, JJ., concur.

## On Rehearing.

PER CURIAM. We have had the benefit of an excellent brief and vigorous oral argument after rehearing granted in the within case.

We are still of the opinion, however, that the error of the trial court in not requiring the jury in specific language in his instructions to make a determination of the amount of punishment to be assessed, in case of a conviction, was not fundamental error. But it was error. No objection was interposed or exception saved, and the error was not presented in motion for new trial or petition in error. The opinion may be referred to for treatment.

But this court has noticed that this kind of error does occur more frequently than it should. We have reconsidered all the evidence and the circumstances presented by the record, and it has now been agreed that the sentence of thirty years imposed by the court should be reduced to fifteen years in the State Penitentiary, and the case as so modified is affirmed.